**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **granted.**

**IT IS FURTHER ORDERED** that plaintiffs' amended complaint is dismissed for failure to plead fraud with particularity.

**IT IS FURTHER ORDERED** that defendant's counterclaim against plaintiff Schuhardt is dismissed without prejudice.

### ORDER OF DISMISSAL

In accordance with the Memorandum and Order entered this same date,

**IT IS HEREBY ORDERED** that this action is **dismissed,** pursuant to Federal Rule of Civil Procedure 9(b). The plaintiffs shall bear the costs.

**NORTH DAKOTA FAMILY ALLIANCE, INC. and Stella Jeffrey, Plaintiffs,**

v.

**Marilyn BADER, et al., Defendants.**

No. A3–04–115.

United States District Court, D. North Dakota, Southeastern Division.

March 21, 2005.

David J. Chapman, Chapman Law Office, Fargo, ND, James Bopp, Jr., Thomas J. Marzen, Bopp, Coleson & Bostrom, Terre Haute, IN, for Plaintiffs.

Tag C. Anderson, Attorney General's Office, Bismarck, ND, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS

HOVLAND, Chief District Judge.

On September 29, 2004, the plaintiffs, the North Dakota Family Alliance and Stella Jeffrey, commenced this lawsuit challenging the constitutionality of limitations placed on statements of judicial candidates in North Dakota. The Plaintiffs brought suit for purposes of challenging Canon 5A(3)(d)(i) and (ii) of the North Dakota Code of Judicial Conduct. The Plaintiffs have also challenged the constitutionality of Article 6, Section 11 of the North Dakota Constitution and Canon 3E(1) of the North Dakota Code of Judicial Conduct. The Plaintiffs contend that these provisions are unconstitutional and violate a judicial candidate's First Amendment right to free speech because the provisions prevent judicial candidates from speaking on disputed legal and political issues.

The judicial canon at issue is Canon 5A(3)(d)(i) and (ii) of the North Dakota Code of Judicial Conduct which provides as follows:

A. All Judges and Candidates.

(3) A candidate for a judicial office:

(d) shall not:

(i) make pledges or promises of conduct in office other than the faithful and impartial performance of duties of the office;

(ii) make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court;

This canon embodies what is commonly referred to as the "pledges and promises clause" and the "commit clause." The Plaintiffs contend that Canon 5A's "pledges and promises clause" and its "commit clause" are unconstitutional on their face and as applied to the 2004 Voter's Guide Questionnaire for Judicial Candidates.

In addition, the Plaintiffs have challenged the constitutionality of North Dakota's recusal clause contained in Canon 3E(1) which provides as follows:

E. *Disqualification*

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer or personal knowledge of disputed evidentiary facts concerning the proceedings;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person;

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

The individual plaintiff, Stella Jeffrey, is a resident of North Dakota who wishes to receive information from the North Dakota Family Alliance regarding the views of judicial candidates for whom she was eligible to vote in November of 2004. The North Dakota Family Alliance is a non-profit, educational organization. Both Plaintiffs contend that Canons 5A and 3E, as well as Article 6, Section 11 of the North Dakota Constitution, and the Judicial Conduct Commission's enforcement policy, muzzle and chill a judicial candidate's protective free speech by prohibiting candidates from announcing their views on disputed legal and political questions. As a result, the Plaintiffs contend they have been deprived of their First Amendment right to receive and publish that protected speech, as well as their

freedom to associate. The Plaintiffs contend that North Dakota's law and policy prohibits protected speech in the same manner as the "announce clause" in *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

The Defendants are individuals sued in their official capacities. They include members of the North Dakota Judicial Conduct Commission, the North Dakota Bar Association Inquiry Committee, and counsel for the North Dakota Judicial Commission. The Plaintiffs served the stated members of the Judicial Conduct Commission in their official capacities on October 11, 2004. It appears the Plaintiffs take the position that members of the North Dakota Bar Association's Inquiry Committee, in their official capacities, are also state actors.

For the reasons discussed below, the Court concludes that the judicial canons which seek to regulate and prohibit statements of candidates for judicial office in North Dakota cannot survive constitutional scrutiny.

## I. *BACKGROUND*

The North Dakota Family Alliance is a non-profit educational organization. It sought to collect and publish data regarding judicial candidates' political philosophy and stance on disputed legal and political issues by sending out a 2004 North Dakota Family Alliance Voter's Guide Questionnaire for Judicial Candidates (2004 Voter's Guide Questionnaire) to judicial candidates. *See* Complaint ¶¶ 15, 17. Many judicial candidates refused to answer the questions on the 2004 Voter's Guide citing the relevant canon of ethics. The 2004 Voter's Guide Questionnaire appears to have been sent to candidates regardless of whether the judicial election was contested. A form letter accompanied the survey

and questions were prefaced with the following disclaimer:

> North Dakota Family Alliance recognizes that all of your responses are subject to the judicial obligations to follow binding precedence of higher courts and applicable constitutional and statutory provisions, to honor stare decisis and to decide any future case based on the law and facts of that case. Your responses indicate your current view on the legal issues and do not constitute any pledge, promise, or commitment to rule any particular way if the legal issue involved comes before you for decision.

*See* Complaint, Exhibit B–5.

The survey asked the judicial candidate to indicate whether he or she would agree or disagree with certain undecided propositions of state constitutional law or whether he or she was undecided or otherwise would decline to speculate on the issues. The survey also invited a response on whether a candidate believed a United States Supreme Court decision had been wrongly decided.

In addition, the survey asked the judicial candidates to identify individuals with whom they share a political and judicial philosophy and to rank their judicial philosophy on constitutional interpretation on a scale ranging from being a "strict constitutionalist" to "a living document approach." The survey asked candidates whether they supported, opposed, or were undecided about a judge's display of the Ten Commandments in the courtroom, presumably for some legitimate, secular purpose. Last, the survey asked judicial candidates to identify organizations the candidate may have been affiliated with for the previous ten (10) years. According to the complaint and the attachments, some candidates completely refused to answer the surveys on the proffered basis of Canon 5 and others responded directly to the survey.

In May 2004, prior to the surveys being sent by the North Dakota Family Alliance, the Judicial Ethics Advisory Committee sent a short letter to judicial candidates with an attached earlier letter addressing the United States Supreme Court decision in *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) and its impact on Canon 5. In *Republican Party of Minnesota v. White*, the Supreme Court struck down a portion of Minnesota's Code of Judicial Conduct referred to as the "announce clause." The letter from the Judicial Ethics Advisory Committee explained that the "announce clause" contained in Minnesota's Code of Judicial Conduct was not present in North Dakota's Code of Judicial Conduct. The letter further suggested that judicial candidates should be familiar with the *White* decision and could request a formal opinion on a specific ethical question.

On July 19, 2004, the North Dakota Family Alliance mailed an explanatory cover letter and a 2004 "Voter's Guide Questionnaire for Judicial Candidates" (2004 Voter's Guide Questionnaire) to all judicial candidates. The questionnaire stated that the questionnaire's deadline was August 4, 2004. The Alliance attempted to obtain responses to a number of questions from judicial candidates so that this information could be announced or otherwise published to North Dakota voters. A copy of the form letter accompanying the survey is attached as Exhibit B–1 to the Complaint (Docket No. 1). The survey followed the form letter and is attached as Exhibit B–2 to the complaint. The survey lists six (6) questions for response followed by a request that the judicial candidate identify his or her membership in a number of organizations as well as the questions requesting the following information:

2004 North Dakota Family Alliance

### Voters' Guide Questionnaire
### For Judicial Candidates

Candidate Name Phone Number
Position/District Sought Fax
Number

1. Which of the following former U.S. Presidents best represents your political philosophy?

 *John F. Kennedy/Jimmy Carter/Ronald Reagan/George Bush (former)* (circle one)

2. Which one of the current Justices of the U.S. Supreme Court most reflects your judicial philosophy?

 *Rehnquist/Stevens/O'Connor/Scalia/Kennedy/Thomas/Souter/Ginsburg/Breyer* (circle one)

3. Rate your judicial philosophy on a scale of 1–10 with strict constitutionist being a 10 and a living document approach being a 1: _____

4. Do you *support/oppose/undecided* (circle one) a judge's display of the Ten Commandments in his or her courtroom?

5. Should the code of Judicial Conduct for judges include protection of people on the basis of sexual orientation?

 *Yes/No/Undecided* (circle one)

6. Put a check by each and every organization (national, state or local chap.) listed below which, in the last 10 years, have been applicable to you: been a member, contributed money, volunteered time, been employed by, been endorsed by for a campaign, received money from for a campaign or had any other affiliation.

 ___ACT–UP
 ___AFL–CIO
 ___Alliance Defense Fund (ADF)
 ___American Civil Liberties Union (ACLU)
 ___American Center for Law and Justice (ACU)
 ___American Conservative Union
 ___American Family Association
 ___American Life League
 ___Americans United for Life (AUL)
 ___Americans United for Separation of Church & State
 ___Anti–Defamation League (ADL)
 ___Brookings Institution
 ___Chamber of Commerce
 ___Children's Defense Fund
 ___Christian Coalition
 ___Christian Legal Society
 ___Citizens Against Government Waste
 ___Citizens for a Sound Economy
 ___Common Cause
 ___Concerned Women for America
 ___Crisis Pregnancy Center
 ___Eagle Forum
 ___EarthFirst
 ___Family Research Council
 ___Focus on the Family
 ___Free Congress Foundation
 ___Gay, Lesbian & Straight Education Network (GLSEN)

The cover letter to the judicial candidates also included a second questionnaire (*see* Exhibit B–5) which read as follows:

2004 North Dakota Family Alliance

### VOTERS GUIDE—FOR JUDICIAL CANDIDATES

### QUESTIONAIRE 2

In *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), the U.S. Supreme Court held that a canon of judicial ethics that prohibited candidates for elective judicial office from "announcing their views on disputed legal or political is-

sues" was unconstitutional. The canon violated the First Amendment because it prohibited speech on the basis of content and because it burdened the free speech of candidates for public office—a category of speech at the core of First Amendment freedoms. **Clearly, candidates for elective judicial office may now express their views on legal and political issues without fear of being sanctioned by judicial or legal ethics authorities.**

**North Dakota Family Alliance recognizes that all of your responses are subject to the judicial obligations to follow binding precedents of higher courts and applicable constitutional and statutory provisions, to honor stare decisis, and to decide any future case based on the law and facts of that case. Your responses indicate your current view on the legal issues and do not constitute any pledge, promise, or commitment to rule in any particular way if the legal issue involved comes before you for decision.**

Please answer the following survey by checking whether you agree with, disagree with, are undecided about, or refuse to respond to the preceding numbered propositions.

### MARRIAGE

1. In *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), the United States Supreme Court recognized a right to homosexual sexual relations under the U.S. Constitution.

**I believe that the North Dakota Constitution does not recognize a right to homosexual sexual relationships.**

Agree Disagree Undecided Refuse to Respond

### BIOETHICS

2. Thus far, the courts of North Dakota have not recognized a "right to abortion" under our North Dakota Constitution.

**I believe that the North Dakota Constitution does not recognize a right to abortion.**

Agree Disagree Undecided Refuse to Respond

### RELIGIOUS FREEDOM

3. In *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), the United States Supreme Court ruled that prayer over the loudspeakers before school athletic events was unconstitutional.

**I believe *Sante Fe Independent School District v. Doe* was incorrectly decided and that prayers before school athletic events violate neither the U.S. nor North Dakota Constitutions.**

Agree Disagree Undecided Refuse to Respond

The North Dakota Family Alliance attached the responses of several judicial candidates to the complaint. While several individuals declined to answer any of the questions or identify their association with or memberships in the organizations listed, others provided answers to some of the questions but refused or declined to answer others. For example, Steven L. Marquart, a successful candidate for a judgeship in the East Central Judicial District, submitted the following letter response to the survey and questionnaire:

### Steven L. Marquart

July 26, 2004

Christina Kindel

Executive Director

North Dakota Family Alliance

4007 N. State St. # 109

Bismarck, ND 58503

RE: Survey of Judicial Candidates

Dear Ms. Kindel:

I am in receipt of your letter of July 19, 2004 with the enclosures. I certainly understand the importance of the issues raised in your survey questions to your organization. As much as I would like

to respond to the questions, the North Dakota Code of Judicial Conduct prevents me from doing so. I am enclosing herewith a copy of Canon 5 that prohibits a judicial candidate from "making statements that commit or appear to commit the candidate with respect to . . . issues that are likely to come before the court." The questions posed in the survey call for such prohibited statements. I am also enclosing a copy of a May 13, 2004 letter from the Judicial Ethics Advisory Board with attachment. As you will see the Board unequivocally takes the position that the Supreme Court's decision in *White* does not affect the candidate's obligation to follow Canon 5.

Therefore, I am unable under the Judicial Canons of North Dakota to respond to your survey. If you would like to have information on my candidacy, please go to my website at *www.marquartfoqudge. com.*

Sincerely yours,

/s/ Steven L. Marquart

Steven L. Marquart

Candidate,

East Central Judicial District Judge # 4

Likewise, Leo F.J. Wilking, a candidate for another judicial vacancy in the East Central Judicial District, indicated that "unfortunately, I am prohibited by Canon 5 of the North Dakota Code of Judicial Conduct from responding to this type of survey." Wilking said that he was "not allowed to make any statement that appears to commit me to rule in a certain way as it regards cases, controversies, or issues likely to come before me as judge." *See* Exhibit D–17.

District Judge Ronald E. Goodman, a sitting district court judge, submitted a similar response which provided as follows: (letterhead omitted)

July 29, 2004

Christina Kindel

Executive Director

North Dakota Family Alliance

4007 N. State St. # 109

Bismarck, ND 58503

RE: Family Alliance Questionnaire

Dear Ms. Kindel,

I received your request to answer a questionnaire on judicial candidates' positions on various issues. I will not return the questionnaire.

*Republican Party of Minnesota v. White* may give judicial candidates a right to publicly express their personal opinions on controversial issues, but it does not create an obligation for them to do so. I feel that a judicial candidate that would answer your questionnaire compromises his· or her service as a judge.

A judge is supposed to be fair and impartial and not bring an agenda to the bench. He is to apply the law to the facts of cases that appear before him. If a judge feels that a matter before her is of such a nature that it might be influenced by her personal feelings it is her obligation to recuse herself from the case. A judge that agrees or disagrees with the statements on your questionnaire paints himself into an ethical corner. He may agree with a prohibition against gay marriage but if he has publicly expressed that opinion he has an obligation under the Rules of Judicial Conduct to recuse himself from the case.

I trust this explains my position.

Sincerely,

/s/ Ronald E. Goodman

Ronald E. Goodman

District Judge

Jonathan T. Garaas, an attorney in Fargo who ran for a judicial vacancy in the East Central Judicial District, responded

in detail to the questionnaire and said that he firmly believed that the electorate is "best served by full adherence to principles of free speech in all venues, not just in campaigns for public office." *See* Exhibit D–4.

Gary Lee, an attorney in private practice in Minot, North Dakota, who was another successful candidate for a judicial vacancy in the district, responded in detail to the survey and questionnaire. *See* Exhibit D–9. A number of other judicial candidates and sitting judges stood behind their interpretation of Canon 5 and either refused to respond or responded to some or all of the issues presented in the candidate questionnaire. It appeared there were many candidates for judicial office who did not respond in any manner to the questionnaire presented by the North Dakota Family Alliance. It is apparent from the record that none of the judicial candidates had requested a formal or informal opinion concerning whether he or she should respond to any of the specific questions posed by the candidate questionnaire.

The Plaintiffs filed this action on September 29, 2004, seeking declaratory and injunctive relief.[1] At the time the complaint was filed, the Plaintiffs also filed a motion seeking to have a hearing on the request for injunctive relief consolidated with a trial on the merits (Docket No. 9). The Plaintiffs also sought to have a final resolution of this matter expedited (Docket No. 8).

On October 5, 2004, District Court Judge Ralph R. Erickson issued an Order of Recusal and disqualified himself from handling the case. Thereafter, the case was assigned to the undersigned to conduct all further proceedings (Docket No. 15). A Notice of Appearance was filed on behalf of the Defendants on October 15, 2004, and a Motion to Dismiss was filed on November 1, 2004.

On November 2, 2004, the Plaintiffs sought to convert their Motion for Preliminary Injunction into a Motion for Summary Judgment (Docket Nos. 19–20). The Plaintiffs also sought additional time to respond to the Defendants' Motion to Dismiss. That response was filed on November 18, 2004 (Docket Nos. 22–23). On November 29, 2004, the Defendants submitted a reply brief (Docket No. 27). In essence, the Defendants contend that the Plaintiffs' action should be dismissed for lack of standing, that the claim is not ripe for adjudication, and that abstention is appropriate and should bar the Plaintiffs' action at this time. The Court will address each of the preliminary issues of standing, ripeness, and abstention.

## II. STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir.2000). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evi-

---

1. Federal lawsuits challenging the "pledges and promises clause" and the "commitment clause" were filed in September 2004 in Alaska, Indiana, Kentucky, and North Dakota. On October 19, 2004, the federal district court in Kentucky issued an injunction barring the enforcement of the judicial canons at issue in this dispute. *Family Trust Foundation of Kentucky, Inc. v. Wolnitzek*, 345 F.Supp.2d 672 (E.D.Ky.2004). The court relied heavily upon *Republican Party of Minnesota v. White* and concluded that Kentucky's canons of judicial conduct, that profess to prohibit candidates from making promises, pledges, or commitments, limits the candidate's ability to announce his or her views in violation of the First Amendment.

dence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R.Civ.P. 56(e); *Krein v. DBA Corp.,* 327 F.3d 723, 726 (8th Cir.2003). A mere trace of evidence supporting the non-movant's position is insufficient. A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial. *F.D.I.C. v. Bell,* 106 F.3d 258, 263 (8th Cir.1997). The facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. LEGAL DISCUSSION

#### A. STANDING

■ Article III of the United States Constitution requires that all litigated matters involve a case or controversy. To satisfy this requirement, a party must establish that he or she has standing to sue. To invoke federal jurisdiction, a party must establish that it has met the requirements of both constitutional and prudential standing. *Lujan v. Defenders of Wildlife,*

504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Delorme v. U.S.,* 354 F.3d 810, 815 (8th Cir.2004). "The burden to show standing is not a mere pleading requirement, but rather an indispensable part of the Plaintiff's case." *Id.* "Each and every element of the standing requirements must be supported in the same way as any other matter on which the Plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* It is well-established that strict compliance with the jurisdictional standing requirement is required. *See Johnson v. State of Mo.,* 142 F.3d 1087, 1088 (8th Cir.1998).

■ In order to establish standing and invoke federal jurisdiction, a plaintiff must demonstrate that (1) he has suffered an injury in fact which is actual, concrete, and particularized; (2) the injury is fairly traceable to the actions of the defendant, i.e., a causal connection; and (3) the injury will be redressed by a favorable decision. *See County of Mille Lacs v. Benjamin,* 361 F.3d 460 (8th Cir.2004) (citing *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)); *U.S. v. Neset,* 235 F.3d 415, 420 n. 3 (8th Cir.2000). As the non-moving parties facing a summary judgment motion, it is the plaintiffs' burden "to present some evidence to establish a genuine question of fact on the standing issues of injury and causation." *Oti Kaga, Inc. v. South Dakota Housing Development Authority,* 342 F.3d 871, 878 (8th Cir.2003). However, the Court's inquiry into standing is not a review of the merits of the plaintiffs' claims. Instead, at the summary judgment stage the Court accepts as true all material facts alleged as long as they are capable of proof at trial.

■ The Court finds that the Plaintiffs satisfy the prudential concern of stating a claim. The United States Supreme Court has recently sought to clarify the principal

of prudential standing in the *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004). The Supreme Court said that within the context of the First Amendment, there is a justification to lessen the prudential limitations on standing. *See Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("It is now well-established that the Constitution protects the right to receive information and ideas.") The Plaintiffs have a right to receive information that is independent of the judicial candidate's right to speak and express their opinions. The Plaintiffs essentially contend that they have been denied their right to receive such information which is a right protected by the First Amendment.

■ With respect to the case-or-controversy requirement of Article III, the Court recognizes that it is a more difficult burden for a plaintiff to establish standing when the government is regulating someone else's speech. However, the constitutional analysis is generally relaxed within the context of examining a claim based upon the First Amendment rights.

In *Federal Election Com'n v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), the plaintiffs challenged a decision of the Federal Election Com'n which held that the American Israel Public Affairs Committee was not required to make disclosures concerning its membership contributions and expenditures. The Federal Election Com'n contended that the plaintiffs lacked prudential and constitutional standing. The Supreme Court addressed the issue of constitutional standing and said as follows:

[t]he "injury in fact" that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors ... and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute

requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that APIAC's financial assistance might play on the specific election. Respondents' injury consequently seems concrete and particular. 524 U.S. 11, 21, 118 S.Ct. 1777, 141 L.Ed.2d 10.

The Supreme Court further said that in most cases in which the harm is widely shared and generalized, the harm to the plaintiff is abstract. A ruling by an Article III court would amount to issuing an impermissible advisory opinion. However, the Supreme Court concluded that "the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts." 524 U.S. 11, 24–25, 118 S.Ct. 1777, 141 L.Ed.2d 10.

The Plaintiffs in this dispute contend that they were denied their right to receive information relating to voting which is protected by the First Amendment. The Court finds that Congress has created a cause of action for the plaintiff in 42 U.S.C. § 1983 and the alleged injury is sufficiently actual, concrete, and particularized to satisfy the prudential standing requirements and the constitutional "injury-in-fact" requirement.

The Court acknowledges that some of the judicial candidates who refused to answer the survey and questionnaire may have simply relied upon the judicial canons to avoid having to respond to difficult questions. No judicial candidate can ever be compelled to answer a questionnaire

such as that circulated by the North Dakota Family Alliance. However, there is nothing in the record to indicate that any of the judicial candidates were using the canons as an excuse not to respond. The Court finds that, at this stage of the controversy, a causal connection exists between the alleged injury and the actions of the Defendants sufficient to satisfy the *Lujan* causation requirement. Further, the alleged injury would be redressed by the issuance of a ruling in this case. Thus, at this stage the Plaintiffs have demonstrated a sufficient basis to establish standing and invoke federal jurisdiction.

### B. *MOOTNESS*

■ "Under Article III of the Constitution, federal courts 'may adjudicate only actual, ongoing cases or controversies.'" *McCarthy v. Ozark School Dist.*, 359 F.3d 1029 (8th Cir.2004) (quoting *National Right to Life Political Action Committee v. Connor*, 323 F.3d 684, 689 (8th Cir. 2003)). Various doctrines, including the doctrine of mootness, provide the tools used to determine whether a plaintiff presents a justiciable case or controversy. *McCarthy v. Ozark School Dist.*, 359 F.3d 1029 (8th Cir.2004). The Eighth Circuit recently stated:

> The Supreme Court has repeatedly described the mootness doctrine as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citations omitted). Thus, "[w]e do not have jurisdiction over cases in which 'due to the passage of time or a change in circumstances, the issues presented ... will no longer be 'live' or the parties will no longer have a legally cognizable interest in the out-

come of the litigation.'" *Van Bergen v. State of Minn.*, 59 F.3d 1541, 1546 (8th Cir.1995) (quoting *Arkansas AFL–CIO v. FCC*, 11 F.3d 1430, 1435 (8th Cir.1993) (en banc)).

*National Right to Life Political Action Committee*, 323 F.3d 684, 691.

■ Although the need to obtain information concerning the views of judicial candidates running in the November 2004 election has now come and gone, the Court finds that this case falls within the exception to the mootness doctrine because it is the type of case that is capable of repetition yet evading review. The capable-of-repetition doctrine applies where the following two circumstances exist: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) quoting *Murphy v. Hunt* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). The Court is satisfied that both conditions exist in this dispute.

### C. *RIPENESS*

■ "The ripeness doctrine flows both from the Article III 'cases' and 'controversies' limitations and also from prudential considerations for refusing to exercise jurisdiction." *Public Water Supply Dist. No. 10 of Cass County Mo. v. City of Peculiar, Mo.*, 345 F.3d 570 (8th Cir.2003)(quoting *Nebraska Public Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037 (8th Cir.2000)). The "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It is well-

settled that the ripeness inquiry requires the examination of both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507. The Eighth Circuit has held "[a] party seeking judicial relief must necessarily satisfy both prongs to at least a minimal degree." *Nebraska Pub. Power,* 234 F.3d 1032, 1039.

"The 'fitness for judicial decision' inquiry goes to a court's ability to visit an issue." *Id.* at 1038. Whether a case is "fit" depends on whether it would benefit from further factual development. *See Nat'l Right to Life Political Action Committee v. Connor,* 323 F.3d 684, 692–93 (8th Cir.2003). The case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities. *See Nebraska Pub. Power,* 234 F.3d 1032, 1038.

Regarding the "hardship" prong, "[a]bstract injury is not enough. It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (internal quotations and citations omitted). "The Plaintiffs need not wait until the threatened injury occurs, but the injury must be 'certainly impending.'" *Paraquad, Inc. v. St. Louis Housing Authority.,* 259 F.3d 956, 958–59 (8th Cir.2001) (quoting *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).

There is no question that the Plaintiffs' alleged harm in being denied the right to receive voting information for the November 2004 state-wide election has passed. However, the Court finds that the claimed injury currently exists because of the uncertainty caused by the existence of Canon 5. The Court also recognizes that North

Dakota may simply choose not to enforce Canon 5A(3)(d)(i) and (ii) against judicial candidates and candidates in the future may respond to similar surveys. However, the claim was ripe at the time the lawsuit was filed and remains ripe for the Court's review. The Plaintiffs could also suffer irreparable harm if the case is not heard because their interests in obtaining information from judicial candidates is time-sensitive and generally becomes useless after the general election on November 2nd. The Court finds that the Plaintiffs' injury relating to Canon 5A(3)(d)(i) and (ii) appears to be ripe for adjudication.

### D. ABSTENTION

Finally, the Defendants contend that the Court should abstain from this action or, in the alternative, certify the matter to the North Dakota Supreme Court pursuant to Rule 47 of the North Dakota Rules of Appellate Procedure to avoid the possibility of an erroneous federal court interpretation of state law. There are several cases which establish the various abstention doctrines which arguably govern this case. *See Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The Defendants seem to contend that *Younger v. Harris* provides some guidance on the issue of abstention. It is well-established that district courts have an obligation and a duty to decide cases properly before them. Abstention before the exercise of federal jurisdiction is the exception rather than the rule. *Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The Court finds that this action involves federal constitutional issues and involves an interpretation of

federal constitutional law. The Defendants have failed to cite to any abstention doctrine that is applicable to this case, and the Court finds that abstention is neither warranted nor appropriate under the circumstances.

## IV. *REPUBLICATION PARTY OF MINNESOTA V. WHITE*

On June 27, 2002, the United States Supreme Court struck down a portion of Minnesota's Code of Judicial Conduct commonly referred to as the "announce clause." The Supreme Court considered only the constitutionality of the "announce clause" because the "pledge and promises clause" and "commit clause" were not challenged.

In *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), attorney Gregory Wersal challenged several provisions of Canon 5 in Minnesota which prohibits certain conduct of judicial candidates, including rules barring candidates from announcing their views on disputed legal and political issues, using political party endorsements, and attending and speaking at party gatherings. Wersal was joined in his suit by the State Republican Party and several other political groups. Wersal had been a candidate for associate justice of the Minnesota Supreme Court. During the campaign he had criticized several Minnesota Supreme Court decisions on issues including crime, domestic violence, welfare, and abortion. Wersal had sought an advisory opinion from the Minnesota Lawyers Professional Responsibility Board concerning the "announce clause" but they refused to respond to his request. The Republican Party of Minnesota then filed suit in federal court to enjoin enforcement of the "announce clause." The district court granted summary judgment on behalf of the defendants and held that the challenged provisions of Canon 5 survived First Amendment scrutiny. *Republican*

*Party of Minnesota v. Kelly,* 63 F.Supp.2d 967 (D.Minn., 1999). This decision was subsequently affirmed by the Eighth Circuit Court of Appeals. 247 F.3d 854 (8th Cir.2001). The plaintiff then filed a petition for certiorari and the Supreme Court granted the petition.

On June 27, 2002, the United States Supreme Court struck down the campaign ethics rule prohibiting judicial candidates from announcing their views. The Supreme Court held that the portion of Canon 5A of the Minnesota Code of Judicial Conduct which provided that a "candidate for a judicial office, including an incumbent judge" shall not "announce his or her views on disputed legal or political issues," violates the First Amendment. Using strict scrutiny, the Court held the "announce clause" was not narrowly tailored to serve the asserted compelling state interest in the judiciary's impartiality. The high court then remanded the case to the Eighth Circuit Court of Appeals to discern what effect, if any, its decision would have on the rest of the plaintiff's challenge. More than a year and a half after the Supreme Court ruling, a three-judge panel of the Eighth Circuit issued a decision and found that some of the candidates' speech prohibitions were unconstitutional but upheld others. *See Republican Party of Minnesota v. White,* 361 F.3d 1035 (8th Cir.2004). The Eight Circuit vacated the panel decision the following month and decided to hear the case *en banc.* Arguments were held before the *en banc* panel of the Eighth Circuit on October 20, 2004, and the decision is forthcoming.

Suffice it to say that the *White* decision has raised far more questions than it answered, particularly for those entities charged with establishing ethical standards for the judiciary. The United States Supreme Court has dramatically changed the landscape for judicial ethics as it re-

lates to judicial campaigns. The primary issue in *White* was whether a judicial candidate could announce his views in a political campaign on disputed legal or political issues and not directly violate the canons of judicial conduct in Minnesota. The judicial candidate contended that the "announce clause" curtailed his freedom of speech under the First Amendment, and the Supreme Court agreed. The Supreme Court expressly held that the "announce clause" violated the First Amendment. The Court also established that the proper test for determining the constitutionality of a restrictive judicial canon was a strict scrutiny test:

> Under the strict-scrutiny test, respondents have the burden to prove that the announce clause is (1) narrowly tailored to serve; (2) a compelling state interest. *E.g., Eu v. San Francisco County Democratic Cent. Committee,* 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). In order for respondents to show that the announce clause is narrowly tailored, they must demonstrate that it does not "unnecessarily circumscrib[e] protected expression." *Brown v. Hartlage,* 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).

536 U.S. 765, 774–775, 122 S.Ct. 2528, 153 L.Ed.2d 694.

The Supreme Court said that the "announce clause" in Minnesota was not narrowly tailored to serve the impartiality of the judiciary or the appearance of impartiality. The Court concluded that the impartiality of judges "may well be an interest served by the announce clause, but it is not a compelling state interest, as strict scrutiny requires." 536 U.S. 765, 777, 122 S.Ct. 2528, 153 L.Ed.2d 694.

Minnesota had identified two state interests served by the restrictions on campaign speech, namely, (1) the preservation of judicial impartiality and (2) the preservation of the appearance of impartiality.

The Supreme Court said that removing preconceptions in favor of or against a particular legal view is simply not a compelling state interest.

"A judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law. As then-Justice REHNQUIST observed of our own Court: "Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions that would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It would be not merely unusual, but extraordinary, if they had not at least given opinions as to constitutional issues in their previous legal careers." *Laird v. Tatum,* 409 U.S. 824, 835, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (memorandum opinion). Indeed, even if it were possible to select judges who did not have preconceived views on legal issues, it would hardly be desirable to do so. "Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." *Ibid.* The Minnesota Constitution positively forbids the selection to courts of general jurisdiction of judges who are impartial in the sense of having no views on the law. Minn. Const., Art. VI, 5 ("Judges of the supreme court, the court of appeals and the district court shall be learned in the law"). And since avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impar-

tiality can hardly be a compelling state interest either."

536 U.S. 765, 777–78, 122 S.Ct. 2528, 153 L.Ed.2d 694.

This case presents the difficult dilemma of balancing the interests of the State of North Dakota to ensure impartiality in the judiciary against the First Amendment rights of judicial candidates to express their opinions on important social, legal, and political issues, and the rights of voters to obtain such information. Justice O'Connor, in her concurring opinion in *White,* noted that thirty-one states still use popular elections to select judges and slightly more than one-half of those states use non-partisan elections such as North Dakota. Justice O'Connor further noted that the practice of electing judges actually undermines the state's interest in an actual or perceived impartial judiciary. Justice O'Connor said that states which provide for the election of judges have:

> Voluntarily taken on the risks to judicial bias.... As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling. If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.

536 U.S. 765, 792, 122 S.Ct. 2528, 153 L.Ed.2d 694 (O'Connor, J., concurring).

 There is no question that when a state attempts to regulate speech on the basis of its content and burdens a category of speech that is at the core of our First Amendment freedoms, i.e., speech about the qualifications of candidates for public office, a strict scrutiny analysis is applied. 536 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694. In order to survive a strict scrutiny analysis, a state has the burden to prove that the abridgement of speech is narrowly tailored to serve a compelling state interest.

## V. THE NORTH DAKOTA CODE OF JUDICIAL CONDUCT

As previously noted, the Supreme Court in *White* held that Minnesota's "announce clause," a canon of judicial conduct which prohibits judicial candidates from announcing their views on "disputed legal or political issues," violates the First Amendment. The Supreme Court did not address the constitutionality of the "pledges or promises clause" of Minnesota's Canon 5A(3)(d)(i) which is identical to North Dakota's Canon 5A(3)(d)(i). The Court in *White* also did not address the validity of the "commit clause," which is a clause that prohibits a judicial candidate from making statements that commit or appear to commit the candidate with respect to cases, controversies, or issues that are likely to come before the court. N.D.Code Jud. Conduct, Canon 5A(3)(d)(ii) [hereinafter referred to as the "commitment clause."]

In 1990, the ABA Model Code replaced the "announce clause" with the "commitment clause." *See* ABA Model Code of Judicial Conduct, Canon 5A(3)(d)(ii) (2000). The ABA made the change because the "announce clause" was viewed as an overly broad restriction on speech. The Minnesota Supreme Court chose to retain the "announce clause" but at least 25 other states, including North Dakota, adopted the "commitment clause" instead. The uncertainty that remains is whether the "announce clause" and the "commitment clause" are essentially one and the same.

In 1991, a federal district court in Kentucky reviewed the pledges and promises clause and the "commitment clause" of the Kentucky Code of Judicial Conduct which was based on the 1990 ABA Model, and was identical to the North Dakota Code of Judicial Conduct Canon 5A(3)(d)(i) and (ii). *Ackerson v. Kentucky Jud. Ret. & Removal Com'n,* 776 F.Supp. 309 (W.D.Ky., 1991). The district court in *Ackerson*

found that both clauses were fatally overbroad to the extent they prohibited a candidate from making pledges, promises, or commitments regarding administrative matters in the court for which he was a candidate. However, both clauses were upheld to the extent they prohibited speech by the judicial candidate on general legal issues which were likely to come before the court of appeals. The *Ackerson* decision was issued in 1991 which was more than a decade before the pronouncement of the United States Supreme Court in *Republican Party of Minnesota v. White.*

In *White,* the Supreme Court held that the "announce clause" was not narrowly tailored to serve a compelling state interest. The Supreme Court refused to give any credence to the assertion that the "announce clause" served a compelling state interest. The Court took Minnesota to task for providing for the popular election of judges but preventing the candidates from "discussing what the elections are about." The Supreme Court said that if the state conducts judicial elections, it must not do so under conditions which breed voter ignorance. Instead, the state must allow candidates discourse to touch on the subject of interest to the voters, including the candidate's views on disputed social, legal, and political issues.

## A. *NORTH DAKOTA CANON 5A(3)(d)(i) and (ii)*

■ Canon 5A(3)(d)(i) prohibits a judicial candidate from making pledges or promises of conduct in office "other than the faithful and impartial performance of duties of the office." Canon 5A(3)(d)(ii) prohibits a judicial candidate from making statements that commit or appear to commit a candidate with respect to cases, controversies, or issues that are likely to come before the court. The "commitment clause" has a limitation which renders it applicable only to any statement that com-

mits the candidate on an issue "likely to come before the court." However, as the Supreme Court pointed noted in *White,* this is not much of a restriction because "[t]here is almost no legal or political issue that is unlikely to come before a judge of an American court, state or federal, of general jurisdiction." 536 U.S. 765, 772, 122 S.Ct. 2528, 153 L.Ed.2d 694. The pledges and promises clause is less restrictive than the "commitment clause." It is only limited to the extent that a judicial candidate can promise "the faithful and impartial performance of the duties of the office."

■ It is well-established that an overbroad law is to be invalidated if the impermissible applications of the law are substantial when compared to the law's legitimate application. *Ways v. City of Lincoln, Neb.,* 274 F.3d 514, 518 (8th Cir. 2001). The overbroad doctrine prevents a law from having a deterrent effect on protected speech. The law may suffer from overbreadth problems if it prohibits more speech than is necessary to achieve the state's interest. *Krantz v. City of Fort Smith,* 160 F.3d 1214, 1219 (8th Cir.1998). It is clear that Canon 5A(3)(d)(i) and (ii) sweep constitutionally-protected speech within its scope. Both the "pledges and promises clause" *and* the "commitment clause" essentially embrace the same speech as the "announce clause" that was struck down by the United States Supreme Court in *White.*

Minnesota's "announce clause" provided that a candidate for a judicial office, including an incumbent judge, shall not announce his or her views on disputed legal or political issues. In the May 2004 letter sent to North Dakota judicial candidates by the Judicial Ethics Advisory Committee, the Committee did not attempt to distinguish the "announce clause" from the "pledges and promises clause" or the "commitment clause" contained within the

North Dakota Code of Judicial Conduct. However, there is little question that the "pledges and promises clause" and the "commitment clause" contained in Canon 5A(3)(d)(i) and (ii) essentially forbid the same speech that the United States Supreme Court held was constitutionally-protected in *White*, namely, speech announcing views on disputed legal and political issues. For example, Canon 5A(3)(d)(ii) prohibits making statements that commit *or* appear to commit the candidate with respect to cases, controversies, or issues that are likely to come before the court. This canon is used to prohibit judicial candidates from stating their views on legal or political matters. The "appear to commit" prohibition clearly renders the canon indistinguishable from the "announce clause" which was struck down as unconstitutional in *White*.

A careful reading of the majority opinion in *White* makes it clear that the "pledges and promises clause" and the "commitment clause" are not long for this world. The justifications offered in support of the "announce clause" in Minnesota—the preservation of an impartial judiciary and the appearance of an impartial judiciary—are the same justifications advanced by North Dakota in support of the "commitment clause" and the "pledges and promises clause." In *White*, those justifications were found to be lacking and insufficient under a strict scrutiny analysis.

It is well-established in *White* that judicial candidates are not prohibited, and cannot be prohibited, from announcing their views on disputed legal or political issues. Neither can judicial candidates be forbidden from stating the same views in response to a survey without rendering the Supreme Court's decision in *White* meaningless. The impermissible overbreadth of the language "appear to commit" is not cured by the fact that its prohibition applies only to judicial candidates and only to issues "likely to come before the court." In North Dakota, a "judicial candidate" is broadly defined as:

> A person seeking selection for retention in judicial office by election or appointment. A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy, declares or files as a candidate with the election or appointment authority, or authorizes solicitation or acceptance of contributions or support.

*See* N.D.Code. Jud. Conduct Canon 5A(1)(a).

Thus, any person who simply states in public an intent to someday run for, or to remain in, elective judicial office is subject to the prohibitions of Canon 5A(3)(d)(i) and (ii). As the Supreme Court noted in *White*, "limiting the scope of the clause to issues likely to come before a court is not much of a limitation at all.... [T]here is almost no legal or political issue that is unlikely to come before a judge of an American court, state or federal, of general jurisdiction." 536 U.S. 765, 772, 122 S.Ct. 2528, 153 L.Ed.2d 694.

The Court finds that Canon 5A(3)(d)(i) and (ii) impermissibly prohibits judicial candidates from announcing their views on disputed political and legal issues. If North Dakota's interest ultimately concerns a judge's impartiality towards parties, the overbroad language of Canon 5A(3)(d)(i) and (ii) does not reflect that interest. Like the "announce clause" struck down by the Supreme Court in *White*, the "pledges and promises clause" and the "commitment clause" are too broadly tailored to serve that interest. These clauses forbid the same type of speech that was found to be constitutionally-protected in *White*.

If North Dakota's interest is in preserving the impartiality of judges by preventing preconceptions, the Supreme Court in *White* specifically held that such an inter-

est is not compelling. As noted by the Supreme Court, no judge is completely without preconceptions. 536 U.S. 765, 778, 122 S.Ct. 2528, 153 L.Ed.2d 694. Further, if North Dakota's interest in impartiality is to preserve open mindedness, such an interest is not reflected in the "pledges and promises clause" or the "commitment clause." Like the "announce clause" in *White*, Canon 5A(3)(d)(i) and (ii) only encompasses pledges and promises and commitments made by judicial candidates. It does not address pledges, promises, and commitments made before the lawyer or judge becomes a judicial candidate. Lawyers and judges have often committed themselves on disputed legal, political, and social issues long before they become candidates for judicial office, either in the form of speeches, lectures, books, letters to the editor, law review articles, legal articles, legal briefs, or previous rulings. In essence, Canon 5A(3)(d)(i) and (ii) permits lawyers and judges to promise or commit themselves on positions concerning disputed legal, political, and social issues until the day they declare their candidacy, after which such pledges, promises, and commitments are strictly prohibited.

The First Amendment states that "Congress shall make no law … abridging the freedom of speech." Along with other provisions of the First Amendment, the free speech clause has been incorporated against the states through the due process clause of the Fourteenth Amendment. That amendment's free speech clause "embodies our profound national commitment to the free exchange of ideas." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002). In a general sense, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." The Supreme Court has recognized that speech about the qualifications of candidates for public office is "at

the core of our First Amendment freedoms" and that any restriction on such speech is subject to strict scrutiny. *Republican Party of Minnesota v. White*, 536 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). Under the strict scrutiny analysis, the Defendant has the burden of proving that the restriction is narrowly tailored to serve a compelling state interest. The Defendants have failed to do so in this case.

The First Amendment also does not permit a state to dictate what information the voters may be trusted with. The First Amendment guarantees voters the right to obtain the information they desire, and to decide what information may be relevant in determining whom to elect to the bench. For First Amendment rights to mean anything, judicial candidates must be allowed to impart whatever information they choose about their views on political, legal, and social issues, and their personal philosophy—without restriction. As Justice Kennedy said in his concurring opinion in *White;*

> Explicit standards of judicial conduct provide essential guidance for judges in the proper discharge of their duties and the honorable conduct of their office. The legislative bodies, judicial committees, and professional associations that promulgate those standards perform a vital public service. *See, e.g.,* Administrative Office of U.S. Courts, Code of Judicial Conduct for United States Judges (1999). Yet these standards may not be used by the State to abridge the speech of aspiring judges in a judicial campaign.
>
> Minnesota may choose to have an elected judiciary. It may strive to define those characteristics that exemplify judicial excellence. It may enshrine its definitions in a code of judicial conduct. It may adopt recusal standards more rigorous than due process requires, and censure judges who violate these standards.

What Minnesota may not do, however, is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State. *See Brown v. Hartlage*, 456 U.S. 45, 60, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). The law in question here contradicts the principle that unabridged speech is the foundation of political freedom.

536 U.S. 765, 794, 122 S.Ct. 2528, 153 L.Ed.2d 694 (Kennedy, J., concurring).

As Justice O'Connor noted, if the state has concerns about judicial impartiality, the solution may be to stop electing judges and make state judgeships appointed offices.

If the State has a problem with judicial impartiality, it is largely one the State has brought upon itself by continuing the practice of popularly electing judges.

536 U.S. 765, 792, 122 S.Ct. 2528, 153 L.Ed.2d 694 (O'Connor, J., concurring).

This Court is of the opinion that there is little, if any, distinction between the "announce clause" which was struck down by the United States Supreme Court in *White*, and the "commitment clause" and "pledges and promises clause" contained in Canon 5A(3)(d)(i) and (ii) of the North Dakota Code of Judicial Conduct. All of the clauses sweep constitutionally-protected speech within its scope. All of the clauses forbid the same type of speech the Supreme Court held was constitutionally-protected in *White*, namely, speech announcing a judicial candidate's views on disputed legal, political, or social issues. There is no real distinction between announcing one's views on legal or political issues and making statements that commit, or "appear to commit," a judicial candidate with respect to cases, controversies, and issues that are likely to come before the court. The Supreme Court in *White* specifically held that a state's interest in a judiciary without preconceived notions about legal or political issues is not a compelling state interest. Simply stated, presenting the appearance that the judge's minds are blank slates, as would be necessary to serve the appearance of impartiality, does not rise to the level of a compelling state interest.

To say that there is considerable uncertainty regarding the scope of the Supreme Court's decision in *White* is an understatement. Whether the decision in *White* left any room for the regulation of the speech of judicial candidates is a question yet to be resolved.[2] However, it is clear the *White* decision dramatically altered the

**2.** In 2003, the American Bar Association amended portions of the Model Code of Judicial Conduct to reflect the decision in *Republican Party of Minnesota v. White*. The amendments eliminated the prohibition on judicial candidates making statements that "appeared to commit" the candidate. The ABA considered the restriction too vague to withstand strict scrutiny analysis. There were at least six states that adopted the 2003 amendments.

In late January 2005, the American Bar Association's joint commission released new draft rules on political activity by judges and judicial candidates which is covered in Canon 5 of the existing code. The draft revisions specifically address the activities of candidates seeking judicial office in partisan public elections. Candidates in partisan elections could speak to gatherings on their own behalf, attend meetings or events sponsored by political organizations, publicly identify themselves as members of or candidates of political organizations, purchase tickets to events sponsored by political organizations, appear in meetings, advertisements, and distribute campaign literature supporting their own candidacy, and publicly endorse or oppose candidates running for other judgeships in the same judicial office. The proposed new language for Canon 5 is posted on the ABA website at *http://www.abanet.org/judicial ethics/drafts.html*

landscape of judicial elections. It has caused, and will continue to cause, considerable uncertainty and consternation on the part of judicial candidates.

The Court is of the opinion that Canon 5A(3)(d)(i) and (ii) does not meet the strict scrutiny test because the canons are not necessary to achieve the state's objective of ensuring impartiality of judges. It should be noted that North Dakota has a recusal provision that ensures impartiality by requiring recusal anytime a judge is unable to render, or appears to be incapable of rendering, a fair and impartial decision. *See* N.D.Code Jud. Conduct, Canon 3E(1). There are other provisions of the North Dakota Code of Judicial Conduct which are also designed to uphold the integrity and independence of the judiciary. *See* N.D.Code Jud. Conduct, Canons 1–4. The "pledges and promises clause" *and* the "commitment clause" contained in Canon 5A(3)(d)(i) and (ii) are not necessary to ensure impartiality. North Dakota's recusal provisions ensure impartiality without restricting constitutionally-protected speech. Although these clauses may serve some additional benefit designed to ensure the appearance of impartiality by preventing judicial candidates from making any public statements which may appear to taint their neutrality, the public's confidence in the judiciary is protected by the recusal statutes.

In summary, the Court concludes that Canon 5A(3)(d)(i) and (ii) of the North Dakota Code of Judicial Conduct impermissibly burdens free speech and violates the First Amendment of the United States Constitution. The "pledges and promises clause," and the "commitment clause," are essentially de facto "announce clauses" which were found to be unconstitutional by the United States Supreme Court in *Republican Party of Minnesota v. White.*

For the same reasons stated in *White*, the Court finds that these clauses violate the First Amendment. The canons prohibit broad areas of speech the Supreme Court has found to be protected by the First Amendment and essential to the democratic process. As Justice Scalia wrote in *White*:

> [d]ebate on the qualifications of candidates is at the core of our First Amendment freedoms, not at the edges. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance. It is simply not the function of Government to select which issues are worth discussing or debating during the course of a political campaign. I have never allowed the Government to prohibit candidates from communicating relevant information to voters during an election.

*White* 536 U.S. 765, 781–82, 122 S.Ct. 2528, 153 L.Ed.2d 694.

Justice O'Connor noted in her concurring opinion that when a state decides to elect its judiciary, it must accept the fact that the state interest in maintaining impartiality will likely suffer some harm. 536 U.S. 765, 792, 122 S.Ct. 2528, 153 L.Ed.2d 694 (O'Connor, J., concurring). As Justice O'Connor said, "If the state chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process the First Amendment rights that attach to their roles." 536 U.S. 765, 788, 122 S.Ct. 2528, 153 L.Ed.2d 694. This Court is of the opinion that Canon 5A(3)(d)(i) and (ii) of the North Dakota Code of Judicial Conduct, as currently drafted, impermissibly restricts constitutionally-protected speech which has been found to be expressly prohibited under *White.*[3]

---

**3.** A similar result was reached by the federal district court in Kentucky in an excellent opinion issued in a case entitled *Family Trust*

## B. *CANON 3E(1)-RECUSAL*

The Plaintiffs have also challenged the constitutionality of Canon 3E(1) of the North Dakota Code of Judicial Conduct which relates to the recusal obligations of judges. The Plaintiffs contend that Canon 3E(1), as applied to the 2004 Voters Guide Questionnaire for Judicial Candidates, is unconstitutional and must be struck down. Again, a strict scrutiny analysis is required. Under this analysis, the Defendants must demonstrate that the recusal provisions in the canon are narrowly tailored to serve a compelling state interest.

The modern view of judicial disqualification is contained in Canon 3E(1) which requires judges to recuse themselves from those proceedings in which impartiality "might reasonably be questioned." The canon lists four specific instances in which a judge must disqualify himself or herself:

E. *Disqualification*

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer or personal knowledge of disputed evidentiary facts concerning the proceedings;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person;

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

There is no question that an impartial judge is critical to due process and the administration of justice. A widespread belief that courts are not impartial—resulting in a loss of public faith in the legal system and an unwillingness to respect its authority—would destroy the judiciary as quickly as would an actual lack of impartiality. The public and individual litigants must be reassured that the judiciary will decide legal disputes based on the law alone rather than on any inherent bias or prejudice of the presiding judge. *Family Trust Foundation of Kentucky, Inc. v. Wolnitzek,* 345 F.Supp.2d 672 (E.D.Ky., 2004).

The Court concludes that North Dakota's Canon 3E(1) is narrowly tailored to serve a compelling state interest. Its purpose is to offer a guarantee to parties that

*Foundation of Kentucky, Inc. v. Wolnitzek,* 345 F.Supp.2d 672 (E.D.Ky., 2004). In addition,

*see Spargo v. N.Y. State Com'n. on Judicial Conduct,* 244 F.Supp.2d 72 (N.D.N.Y., 2003).

the judge will apply the law in the same manner that would be applied to any other litigant. When a judge may have a particular bias or prejudice, the recusal provisions require the judge to remove himself or herself from the case. The recusal provisions in Canon 3E(1) serve the state's interest in impartiality and the canon is narrowly drafted to achieve that interest. For the same reasons as set forth above, Article 6, Section 11 of the North Dakota Constitution also survives a constitutional challenge.

## VI. *CONCLUSION*

In *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), the United States Supreme Court expressly held that states, in light of voter's need for information, could not prohibit judicial candidates from announcing their views on disputed legal or political issues. The "pledges and promises clause" and the "commitment clause" found in the North Dakota Code of Judicial Conduct essentially prohibit the same type of constitutionally-protected speech. Canon 5A(3)(d)(i) and (ii) impermissibly prohibits judicial candidates from announcing their views on legal, political, and social issues. Like the "announce clause" struck down by the Supreme Court in *White*, the "pledges and promises clause" and the "commitment clause" are broadly tailored and fail to serve a compelling state interest. Simply stated, Canon 5A(3)(d)(i) and (ii) is not necessary to achieve the state's objective of ensuring impartiality of judges. As Justice Scalia noted in *White*,

"[D]ebate on the qualifications of candidates" is "at the core of our electoral process and of the First Amendment freedoms," not at the edges. *Eu*, 489 U.S., at 222–223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (internal quotation marks omitted). "The role that elected officials play in our society makes it all the more

imperative that they be allowed freely to express themselves on matters of current public importance." *Wood v. Georgia*, 370 U.S. 375, 395, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). "It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign." *Brown*, 456 U.S., at 60, 102 S.Ct. 1523, 71 L.Ed.2d 732 (internal quotation marks omitted). We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.

536 U.S. 765, 781–782, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

This Court is persuaded that Canons 5A(3)(d)(i) and (ii) pose a chilling effect on a judicial candidate's efforts and desire to express his or her views to the public on problems confronting the judiciary and how the candidate proposes to deal with them. These canons impose a direct limitation on expressions that are protected under the First Amendment, and which the United States Supreme Court in *White* said was constitutionally-protected speech. It is clear that a judicial candidate's speech during an election campaign occupies the core of the protections afforded by the First Amendment. *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). The pronouncement of the United States Supreme Court in *White* evidences a strong trend toward permitting open speech in judicial campaigns. A state may not unduly regulate campaign speech because judicial candidates enjoy First Amendment protection *and* the voters are entitled to information about judicial candidates so they can intelligently cast their votes.

There is certainly nothing in this opinion that requires any judicial candidate to re-

spond to a North Dakota Family Alliance Voter's Guide Questionnaire in the future, or to respond to any other questionnaires or surveys sent out to candidates before an election. Any judicial candidate who responds to a survey similar to the 2004 Voter's Guide Questionnaire may indeed create a serious ethical dilemma for himself or herself that would require recusal at a later date. It is well-established that there is a judicial obligation to avoid prejudgment and all litigants are entitled to "an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Nevertheless, it is clear under *White* that because North Dakota has chosen to select its judges by popular election, the State may not impermissibly restrict the constitutionally-protected speech of judicial candidates. The Plaintiff's Motion for Summary Judgment (Docket No. 6) is **GRANTED.** Defendants' Motion to Dismiss (Docket No. 18) is **DENIED.** Let judgment be entered accordingly.