# Order

**Michigan Supreme Court**
**Lansing, Michigan**

March 31, 2010

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

137111 (145)(159)

ANTHONY PELLEGRINO, Individually and
as Personal Representative of the Estate of
Shirley Ann Pellegrino,
          Plaintiff-Appellee,

v

AMPCO SYSTEMS PARKING,
          Defendant-Appellant.

SC: 137111
COA: 274743
Wayne CC: 03-325462-NI

_____/

By order of January 28, 2010, the Court granted the motion for full-Court consideration of the motion for disqualification of Justice Markman and denied the plaintiff's motion to disqualify Justice Markman.

By order of January 28, 2010, the Court denied the motion for a full-Court decision on the motion to disqualify Justice Corrigan.

By order of January 28, 2010, the Court denied the motion for a full-Court decision on the motion to disqualify Justice Young.

KELLY, C.J. (*concurring*).

I concur with the Court's resolution of the motions seeking the recusal of Justices Corrigan, Young, and Markman. I write separately in response to Justices Corrigan's and Young's decisions to not participate.

## THE DUTY TO SIT

Justices Corrigan and Young's reason for not participating, as they have stated here and in their dissenting statements in ADM 2009-4, is that amended MCR 2.003 is unconstitutional. Surely Justices Corrigan and Young are entitled to their personal view on this subject. But neither this Court nor any other has adopted that view. Hence, amended MCR 2.003 is clothed in a presumption of constitutionality.[1]

---

[1] Court rules are interpreted using the same principles that govern statutory interpretation. *Haliw v Sterling Hts*, 471 Mich 700, 704 (2005). Statutes are clothed in a presumption of constitutionality. *Johnson v Harnischfeger Corp*, 414 Mich 102, 114 (1982); see also, *State v Albert*, 899 P2d 103, 113 n 15 (Alas, 1995) ("Court rules, like statutes and regulations, are presumptively constitutional and the burden of proving

Moreover, a justice has an affirmative duty to participate to the extent possible in matters that are brought before this Court. As former Chief Justice Taylor and Justice Markman stated in a 2006 Court decision, "Particularly on the supreme court of a state, a body in which judges who recuse themselves cannot be replaced, it is necessary that judges participate in cases in which recusal is not required."[2] This doctrine is known as the "duty to sit." Under that duty, there is an obligation for a justice to remain on any case unless disqualified from doing so.[3] Indeed, the United States Court of Appeals for the Second Circuit has opined that "where the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited."[4] Therefore, one wonders by what authority Justices Corrigan and Young refuse to acknowledge the constitutional status of the rule at present and, given their duty to sit, refuse to vote on this motion.[5]

THE CONSTITUTIONALITY OF MCR 2.003

With respect to their challenges to the constitutional status of MCR 2.003, Justices

---

unconstitutionality is on the party challenging them."); *Suchit v Baxt*, 176 NJ Super 407, 425 (1980) ("Rules adopted by the Supreme Court are presumed constitutional, and it is the burden of the party contesting the rule to show that the Supreme Court's rule is in fact arbitrary and unreasonable."); *Campuzano v Peritz*, 376 Ill App 3d 485, 490 (2007) ("'Supreme Court rules are to be construed in the same manner as statutes.' Statutes are presumed constitutional . . . .") (citations omitted); *State v Waldon*, 148 Wash App 952, 962 (2009) ("'"The construction of court rules is governed by the principles of statutory construction."' . . . Statutes are presumed constitutional as written and should be construed to be constitutional if possible. '[A] court rule will not be construed to circumvent or supersede a constitutional mandate.'") (citations omitted).

[2] *Adair v Michigan*, 474 Mich 1027, 1030 (2006) (statement of Taylor, C.J., and Markman, J.). Justices Corrigan and Young did not join former Chief Justice Taylor and Justice Markman's decision on the recusal motion in *Adair*, but they explicitly endorsed the legal analysis of the ethical questions presented in it. *Id*. at 1051 n 1 (statement of Corrigan, J.); *id*. at 1053 (statement of Young, J.).

[3] See *Laird v Tatum*, 409 US 824, 837 (1972) (memorandum of Rehnquist, J.).

[4] *In re Aguinda*, 241 F3d 194, 201 (CA 2, 2001).

[5] Justice Young claims that "it is not clear that the duty to sit even applies to collateral motions *within* cases before this Court." This distinction is unsupported by any authority. While a recusal motion may be "collateral" in that it is not dispositive of the merits of a controversy, it is surely critical to the ultimate resolution of a case. Their participation in the underlying appeal does not excuse Justices Corrigan and Young from their duty to sit in all matters before the Court from which they are not disqualified.

Corrigan and Young argue that the insertion in the rule of the "appearance of impropriety" standard has rendered the rule unconstitutional.[6] However, federal district courts have rejected First Amendment constitutional challenges to a recusal standard that is synonymous with the "appearance of impropriety" standard on numerous occasions.[7] Indeed, those courts have determined that a state has a compelling interest in preserving the public's confidence in the integrity and impartiality of its judiciary. Moreover, the courts have repeatedly found that such recusal rules are narrowly tailored to meet that interest and are neither overbroad nor vague.[8] As a result, they do not "chill" a judge's freedom of speech and do not violate the First Amendment.[9]

---

[6] Justice Young claims that my defense of the constitutionality of MCR 2.003 is "little more than a pastiche of legal non sequiturs." *Post* at __. The fact remains, Justices Corrigan and Young fail to cite any controlling authority for their assertion that MCR 2.003, as amended, or the "appearance of impropriety" standard, generally, is unconstitutional. I do not contend that they have not given their reasons why they believe the rule is unconstitutional, but contend that their reasons lack apposite legal authority.

[7] These cases have arisen in situations in which organizations send questionnaires to judicial candidates seeking their views on controversial issues. Judges often refuse to respond, citing a possible breach of the judicial canons. The organizations then file suit, alleging that canons that call for recusal if a judge's impartiality might reasonably be questioned are unconstitutional because they chill a candidate's protected speech under *Republican Party of Minnesota v White*, 536 US 765 (2002).

The merits of these constitutional claims have not been addressed by circuit courts of appeals because they are generally dismissed due to a lack of standing or ripeness. See, e.g., *Florida Family Policy Council v Freeman*, 561 F3d 1246 (CA 11, 2009).

[8] *Bauer v Shepard*, 634 F Supp 2d 912, 948-950 (ND Ind, 2009); *Indiana Right to Life, Inc v Shepard*, 463 F Supp 2d 879, 887 (ND Ind, 2006), rev'd in part on other grounds 507 F3d 545 (CA 7, 2007); *Alaska Right to Life Political Action Comm v Feldman*, 380 F Supp 2d 1080, 1084 (D Alas, 2005), vacated in part on other grounds 504 F3d 840 (CA 9, 2007); *North Dakota Family Alliance, Inc v Bader*, 361 F Supp 2d 1021, 1043-1044 (D ND, 2005); *Family Trust Foundation of Kentucky, Inc v Wolnitzek*, 345 F Supp 2d 672, 687 (ED Ky, 2004).

[9] Assuming, *arguendo*, that MCR 2.003 limits a judicial candidate's constitutional right to free speech, it remains unclear if forced disqualification because of that speech constitutes a "penalty" giving rise to First Amendment standing. In *Florida Family Policy Council*, 561 F3d at 1254-1255, the court declined to answer this question, concluding that the plaintiff could not show that his claim was redressable. If forced disqualification is not a "penalty," a justice cannot make an adequate showing of "actual injury" to establish standing. *Id.* at 1255 ("If . . . the only penalty is disciplinary sanctions for a refusal to disqualify, then a judge's fear of penalty is not objectively reasonable. The fear is not objectively reasonable because it depends on speculation and

Furthermore, a justice's due process rights are not violated by the amended version of MCR 2.003. The rule does not deny any rights to a justice who is recused against his or her will. In his concurring opinion in *Republican Party of Minnesota*, Justice Kennedy noted that states are free to "adopt recusal standards *more rigorous* than due process requires, and censure judges who violate these standards."[10] Justice Kennedy's majority opinion in *Caperton v A T Massey Coal Co, Inc*[11] reaffirmed this point. *Caperton* specifically observed that the vast majority of states have adopted the "appearance of impropriety" standard, a more rigorous standard than is required by due process. The Court noted that most disputes over disqualification will be resolved under state standards. Similar generally worded canons of judicial conduct have been upheld in the face of constitutional challenges raised by judges sanctioned under those canons.[12]

In support of their argument, Justices Corrigan and Young cite provisions of the state constitution that provide for removing a justice from office. But these provisions are inapposite. Recusal deals only with removing a justice from a case, not removing him or her from office.

For decades this Court has had an unwritten practice that allowed an individual justice to decide recusal motions directed at that justice. Additionally, we have held that each justice has equal power and authority with respect to his or her colleagues.[13] Thus, allowing an individual justice to overrule another justice's decision on a recusal motion

---

conjecture that instead of disqualifying himself where the canons require him to do so, the judge will refuse and face discipline.").

Canon 2 of the Michigan Code of Judicial Conduct is similar to Canon 3(E)(1) of the Florida Code of Judicial Conduct, which was at issue in *Florida Family Policy Council.* Canon 2 requires a judge to adhere to the "appearance of impropriety" standard, which presumably should result in the justice recusing himself/herself when an appearance of impropriety exists.

[10] *Republican Party of Minnesota*, 536 US at 794 (Kennedy, J., concurring) (emphasis added).

[11] *Caperton v A T Massey Coal Co, Inc*, 556 US ___; 129 S Ct 2252 (2009).

[12] See, e.g., *In re Assad*, __ Nev __; 185 P3d 1044, 1052 (2008), which upheld Canon 2, § 2(A) of the Nevada Code of Judicial Conduct against a due process challenge. Nevada Canon 2(A) provides, "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

[13] See, e.g., *People v Paille #1*, 383 Mich 605, 607 (1970) ("Whatever intra-court battles occasioned the adoption of the restriction upon intra-court review, the wisdom of preventing judges of equal station from overruling each other abides.").

would violate this principle. However, also for decades, a majority of four justices has had the authority to make binding orders and judgments on cases and controversies that come before the Court.[14] A motion for the recusal of a justice is a "controversy" like others that come before the Court. This is especially true once a party has filed such a motion and the challenged justice has refused to recuse himself or herself.

Therefore, I disagree with Justices Corrigan and Young that the principle of "one man, one vote" and the voters' right to elect their justices are violated by MCR 2.003. The new recusal rule is intended to protect the due process rights of litigants when a justice improperly refuses to recuse himself or herself.[15] As noted previously, the removal of a justice from an individual case is far different from the removal of a justice from office. Protecting the due process rights of litigants in a particular case or controversy thus *supports*, not undermines, the voters' right to elect fair and unbiased members of this Court.

Justice Corrigan also claims that her "research has disclosed that no state requires recusal on the basis of a general 'appearance of impropriety,' let alone permits other justices to force a colleague's recusal on the basis of such a standard." She is mistaken. By Justice Corrigan's own count,[16] there are at least eight other states in which a justice's decision not to recuse himself or herself may be reviewed by the entire court.[17] In other states, review by the full court may be available, but remains an open question.

---

[14] In limited circumstances not applicable here, five votes are necessary for the Court to take action.

[15] Justice Young sees no justification for permitting the disqualification of a justice for a violation of Canon 2 of the Michigan Code of Judicial Conduct that has nothing to do with a particular case. *Post* at __. I disagree. Certainly such a justification would exist if a justice was apparently biased for or against the attorney representing a party in a case. In that event, it could be argued that the appearance of impropriety had nothing to do with the case itself. Another example could be found when a justice has become incompetent. If that justice's "'conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with . . . competence is impaired,'" *Caperton*, 129 S Ct at 2266 (citation omitted), then that justice should be recused; in that instance, the appearance of impropriety arguably has nothing directly to do with the substance of the case from which the justice should be recused. From these examples, it becomes obvious that grounds for recusal should not be narrowly confined to the case before the court in order for a justice to be removed from the case.

[16] See the chart accompanying Justice Corrigan's statement in this matter.

[17] Justice Corrigan claims that many states' practices in this regard are unwritten and rarely exercised, so comparison is difficult. The fact remains that other states *do* allow justices to vote on their colleagues' recusal decisions.

Similarly, virtually all states require recusal for the appearance of impropriety. Some states require recusal when the judge's impartiality might reasonably be questioned. This is a standard indistinguishable from the appearance of impropriety. Justice Corrigan thus attempts to make a distinction between the two when there is none.

Evidence that these two standards are functionally identical and treated as such abounds. For example, Mississippi allows its supreme court justices to review an individual justice's decision to deny a recusal motion. The Mississippi Rules of Appellate Procedure provide that "[a]ny party may move for the recusal of a justice of the Supreme Court or a judge of the Court of Appeals if it *appears that the justice or judge's impartiality might be questioned by a reasonable person* knowing all the circumstances, or for other grounds provided in the Code of Judicial Conduct or otherwise as provided by law." Miss R App P 48C(a)(i). Canon 2(A) of the Mississippi Code of Judicial Conduct defines the test for an "appearance of impropriety" as "whether, based on the conduct, the judge's impartiality might be questioned by a reasonable person knowing all the circumstances." Hence, the two standards are defined using *identical* language. Other examples equating the two standards are abundant in caselaw throughout the United States.[18]

Justice Corrigan also criticizes the "appearance of impropriety" standard as a broad, generally subjective and aspirational standard by which judges cannot meaningfully judge one another. Yet Justice Young, who has joined Justice Corrigan's statement, explicitly disagrees. In *Henry v Dow Chem Co*, Justice Young, responding to Justice Weaver's statement regarding her participation in that case, stated:

> "Moreover, Justice Weaver has advocated a disqualification standard that requires judges to recuse themselves if there is merely an *appearance* of impropriety. She has cited with approval Canon 2 of the ABA Model Code of Judicial Conduct, which states that '[a] judge shall avoid . . . the appearance of impropriety in all of the judge's activities' and Model Canon

---

[18] See, e.g, *Tracey v Tracey*, 97 Conn App 278, 281 (2006) ("'The [party] has met its burden [of showing that a judge's impartiality might reasonably be questioned] if it can prove that the conduct in question gave rise to a reasonable appearance of impropriety.'") (citations omitted; second alteration added); *Sussel v Honolulu City & Co Civil Service Comm*, 71 Hawaii 101, 103 (1989) ("'[A]n appearance of impropriety' is the proper standard and any commissioner whose impartiality might reasonably be questioned should be disqualified from hearing the appeal."); Leslie W. Abramson, *Appearance of impropriety: Deciding when a judge's impartiality might reasonably be questioned*, 14 Geo J Legal Ethics 55, 55 n 2 (2000) ("Whether a judge's impartiality might reasonably be questioned is also referred to as the appearance of partiality, the appearance of impropriety, or negative appearances."). The title of Professor Abramson's law review article speaks for itself.

3(E)(1), which states that a judge 'shall disqualify . . . herself in a proceeding in which the judge's impartiality might reasonably be questioned.'

"The disqualification standard that she has publicly championed is an *objective* standard, not a subjective standard to be determined by her say-so."[19]

In *Caperton*, Justice Kennedy also referred to the "appearance of impropriety" standard as an objective one.[20]

Finally, Justice Young, with whom Justice Corrigan agrees, claims that the "lack of case-specific limitations of the 'appearance of impropriety' clause illustrates the unseemly haste with which the majority was driven to amend" MCR 2.003. Haste did not occur here. Disqualification is an issue that has been at the forefront of the Court's attention for many years. In 2006, in *Grievance Administrator v Fieger*, Justice Cavanagh wrote:

. . . I take this opportunity to note that three alternate proposals, two of which have been crafted by [the former] majority, regarding how this Court should handle disqualification motions have been languishing in this Court's conference room for a substantial period of time. In the same way I will look forward to the dust settling from the case at bar, I will similarly anticipate this Court's timely attention to the important matter of disqualification motions. I take my colleagues at their word that the issue of disqualification will be handled in a prompt manner in the coming months.[21]

Thus, criticism of the amendments of MCR 2.003 as being "hast[y]" is off the mark.

IMPLICATIONS OF NONPARTICIPATION

Justices Corrigan's and Young's decisions not to participate in today's decision are difficult to fathom. Apparently, the justices believe that their views regarding the legitimacy of the validly enacted rule of this Court supersede the binding nature of the rule. They provide no authority justifying their refusal to vote.

---

[19] *Henry v Dow Chem Co*, 484 Mich 483, 544 (2009) (opinion by Young, J.) (citation omitted; emphasis in original).

[20] *Caperton*, 129 S Ct at 2266.

[21] *Grievance Administrator v Fieger*, 476 Mich 231, 327 n 17 (2006) (Cavanagh, J., dissenting).

The Michigan Supreme Court operates by majority rule, meaning that four justices have the power to render binding decisions on behalf of the Court. Those decisions bind not only the parties to the controversies before the Court, but also the individual members of the Court. Should an individual justice disagree with the majority's decision, that justice is free to dissent from the majority's action. But a dissenting justice is not entitled to ignore or abandon his or her duty to decide matters that come before the Court. Nor may a justice announce by declarative fiat that the Court's action is null and void. As Justice Young stated in *Sazima v Shepherd Bar & Restaurant*, "I was not aware that a *dissenting* justice could purport (much less had the authority) to nullify a holding of a majority of this Court by simple declarative fiat."[22] Justice Corrigan explicitly acknowledged this principle in her dissent from the amendments of MCR 2.003.[23]

Justices Corrigan's and Young's decisions not to participate set a disturbing precedent that one cannot reasonably believe they intend to create. Their decisions are analogous to a justice refusing to participate in a matter governed by precedent from which that justice dissented. Essentially, Justices Corrigan and Young now state that, because they do not agree with MCR 2.003, as amended, they will refuse to follow it.[24] By contrast, I note that, despite his disagreement with the Court's amendment of MCR 2.003, Justice Markman has participated in each of this Court's decisions on the motions for recusal.

Furthermore, by refusing to vote in this matter, Justice Young engages in a telling

---

[22] *Sazima v Shepherd Bar & Restaurant*, 482 Mich 1110, 1111 (2008) (Young, J., concurring) (emphasis in original).

[23] See the order amending MCR 2.003, 485 Mich cxxiii-cxxiv (2009) (Corrigan, J., dissenting), citing *Paille #1*, *Dodge v Northrop*, 85 Mich 243, 245 (1891) ("Courts of concurrent jurisdiction cannot set aside or modify the orders and decrees of other courts of like jurisdiction."), *In re Wayne Co Prosecutor*, 110 Mich App 739, 742 (1981) (noting the holding in *Paille #1* that "the dual function of Detroit Recorder's Court as a magisterial court as well as a felony trial court does not provide for intra-court review whereby judges of equal station might overrule one another"), and *Wayne Co Prosecutor v Recorder's Court Judges*, 81 Mich App 317, 322 (1978) ("Judges of co-equal authority lack jurisdiction to set aside the orders of bond forfeiture issued by their fellow judges.").

[24] Justice Young claims that he "merely dissent[s]" from the Court's justifications for the amended disqualification rule. *Post* at __. But Justice Young's statement is not a dissenting statement. If it were, "(*dissenting*)" would appear after "Young, J." at the outset of the text. It does not. A dissenting statement would also indicate that Justice Young *is* participating, but that he disagrees with the Court's reasoning or analysis. By contrast, Justice Young's statement is an explanation of his refusal to participate and acknowledge that he is bound by MCR 2.003, as amended.

inconsistency. In cases involving the application of MCR 7.305(B), Justice Young has voiced his belief that the court rule is unconstitutional but has conceded that he is bound to follow it. He thereafter participated in cases applying that rule. For example, in *In re Certified Question (Waeschle v Oakland Co Medical Examiner)*, Justice Young stated:

> I continue to adhere to my stated position in *In re Certified Question (Wayne Co v Philip Morris, Inc)*, that this Court lacks the authority under state law to answer certified questions. However, this position has failed to carry the day. As the final arbiter of state law, this Court has concluded that it has the authority to answer certified questions. Accordingly, while this Court may exercise that authority, I will exercise careful discretion before answering any certified question. I would decline to answer the question in this instance.[25]

Thus, Justice Young, despite disagreeing with the Court's conclusion in *In re Certified Question (Wayne Co v Philip Morris, Inc)* that it has the authority to answer certified questions, *did* in fact exercise that authority. He also properly conceded that a majority of this Court acts as the final arbiter of state law.

Having made that concession, Justice Young now claims that "this Court's final authority does not extend to questions of *federal* constitutional law."[26] Accordingly, he believes that he can rightfully refuse to participate in the matter now before the Court. Admittedly, this Court is not the final arbiter of federal constitutional law. That power rests with the United States Supreme Court. Yet, as Justice Young well knows, until a majority of this Court or the United States Supreme Court declares the rule unconstitutional under the state or federal constitution, a presumption of constitutionality attaches to the rule. Justice Young is not released from the binding effect of the presumption that the rule is constitutional by an earnest belief that it is unconstitutional. Also, he can hardly sustain his assertion that he has "never claimed that the Court's action [regarding the amendments of MCR 2.003] is ineffective" if he refuses to abide by the rule.[27]

---

[25] *In re Certified* (*Waeschle v Oakland Co Medical Examiner*), 485 Mich ___ (Docket No. 140263, entered March 12, 2010) (Young, J., dissenting) (citations omitted). In *In re Certified Question (Wayne Co v Philip Morris, Inc)*, 622 NW2d 518 (2001), Justice Young opined that the Court lacked the constitutional authority to resolve certified questions under MCR 7.305(B). He stated, "However, because that position did not carry the day, I concur in the order in this case requesting supplemental briefing and oral argument." *Id*.

[26] *Post* at __ (emphasis in original).

[27] *Post* at __.

Likewise, in *In re Certified Question from the Fourteenth District Court of Appeals of Texas (Miller v Ford Motor Co)*, the majority opined:

> Concerning Justice Cavanagh's solicitude for Justice Young's 'constitutional conscience,' Justice Young . . . has written that this Court lacks the authority to answer certified questions, but his position did not carry the day. Five justices, including Justice Cavanagh, disagreed. Just as Justice Cavanagh is within his rights as a supporter of certified questions not to answer a certified question in a particular case (his position here), Justice Young as an opponent of certified questions is within his rights to answer a certified question, because this is now a part of our state's 'judicial power.' Indeed, Justice Young has previously answered certified questions and, in fact, authored a majority opinion responding to a certified question. Justice Young also joined Justice Cavanagh's opinion in *Wayne Co [v Philip Morris, Inc]*. . . . In respecting that the law is the law even where he disagrees with that law, Justice Young's determination to respect the majority position of this Court and to participate in certified questions is the only honorable position that could be taken by a justice of this Court.[28]

Justice Young signed the majority opinion in that case. Yet now, in an analogous case involving application of a court rule that Justice Young believes is unconstitutional, he strays from his previously announced principles.

Finally, I do not expect that members of this Court will always agree about what the law is or how to apply it in a given case. But I do hope that our disagreements will focus on the legal issues,[29] providing a level of discourse appropriate to the state's highest court. The emotional[30] and political[31] rhetoric that peppers Justices Corrigan's

---

[28] *In re Certified Question from the Fourteenth District Court of Appeals of Texas (Miller v Ford Motor Co)*, 479 Mich 498, 502 n 2 (2007) (citations omitted).

[29] Both Justice Young and Justice Corrigan claim that the majority has refused to consider the significant constitutional issues that they have asked be considered. *Post* at __. This claim is belied by the record of our public administrative conference of March 11, 2010, when the Court devoted more than 30 minutes of discussion to the merits of their proposed amendments to MCR 2.003. See minutes 2:35:30 to 3:08:55 of the March 11, 2010, public administrative conference at <http://www.michbar.org/courts/virtualcourt.cfm> (accessed March 25, 2010).

[30] See *post* at __ ("Chief Justice Kelly's . . . statement[] . . . contain[s] little more than a pastiche of legal non sequiturs."); *post* at __ ("MCR 2.003(C)(1)(b)(ii) is a startling and supremely stupid policy that could have no conceivable purpose . . . ."); *post* at __ ("Unfortunately, majorities rarely conceive or concede that *they* could be capable of

and Young's statements is ill-suited to this pursuit.

CONCLUSION

In sum, Justices Corrigan and Young have abdicated their duty to sit in this matter. Additionally, their claim that MCR 2.003 is unconstitutional is without merit and unsupported by any legal authority. Nearly all other states employ a recusal rule incorporating language similar to our "appearance of impropriety" standard. Furthermore, in at least eight other states, a justice's decision not to recuse himself or herself may be reviewed by the entire court.

As amended, MCR 2.003 puts into writing for the first time a formal procedure for the disqualification of justices of this Court. In doing so, the Court has become more accountable to litigants and to the public generally. I continue to believe that the justice system and this Court can only be stronger for it.

HATHAWAY, J. (*concurring*).

I concur with this Court's resolution of the disqualification motions seeking the recusal of Justices Corrigan, Young, and Markman. Further, I fully agree with the analysis set forth in Chief Justice Kelly's concurring statement.

I, too, believe it is clear that our newly adopted amendments to MCR 2.003 are constitutional and appropriate. First and foremost, the United States Supreme Court has already addressed this issue. See *Caperton v A T Massey Coal Co, Inc*, 556 US ___; 129 S Ct 2252; 173 L Ed 2d 1208 (2009). *Caperton* set forth, clearly and unequivocally, that it is appropriate for states to adopt the appearance-of-impropriety standard within their canons of ethics and to incorporate that standard into their disqualification rules. The *Caperton* opinion states:

> One must also take into account the judicial reforms the States have implemented to eliminate even the appearance of partiality. *Almost every State*—West Virginia included—*has adopted the American Bar Association's objective standard: "A judge shall avoid impropriety and the appearance of impropriety."* ABA Annotated Model Code of Judicial Conduct, Canon 2 (2004); see Brief for American Bar Association as

---

abuse of power."); *post* at __ ("[The Chief Justice's] claim denigrates the judicial offices that Michigan citizens have entrusted to their judges.").

[31] See *post* at __ ("""I think the national recusal movement is an effort to so gum up [judicial] elections that we are almost forced into an alternative, such as appointing judges."""") (citations omitted).

*Amicus Curiae* 14, and n. 29. *The ABA Model Code's test for appearance of impropriety is "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired*." Canon 2A, Commentary; see also W. Va. Code of Judicial Conduct, Canon 2A, and Commentary (2009) (same).

* * *

These codes of conduct serve to maintain the integrity of the judiciary and the rule of law. The Conference of the Chief Justices has underscored that the codes are "[t]he principal safeguard against judicial campaign abuses" that threaten to imperil "public confidence in the fairness and integrity of the nation's elected judges." Brief for Conference of Chief Justices as *Amicus Curiae* 4, 11. This is a vital state interest:

"Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order." *Republican Party of Minn.* v. *White*, 536 U. S. 765, 793 (2002) (Kennedy, J., concurring).

*It is for this reason that States may choose to "adopt recusal standards more rigorous than due process requires." Id.*, at 794; see also *Bracy* v. *Gramley*, 520 U. S. 899, 904 (1997) (distinguishing the "constitutional floor" from the ceiling set "by common law, statute, or the professional standards of the bench and bar").

"The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and *the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today.*" [*Aetna Life Ins Co v*] *Lavoie*, [475 US 813,] 828[(1986)]. Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution. Application of the constitutional standard implicated in this case will thus be confined to rare instances. [*Caperton*, 129 S Ct at 2266-2267 (emphasis added).]

Our newly amended rule was designed to specifically address disqualification in keeping with the standards and principles enunciated in *Caperton*. Our new rule provides, in pertinent part:

(1) Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:

\* \* \*

(b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v* [*A T*] *Massey* [*Coal Co, Inc*, 556] US ___; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.  [MCR 2.003(C)(1).]

The new rule is not unconstitutional or inappropriate merely because a minority of justices on this Court disagree with incorporating an *appearance of impropriety* standard within the rule.  As recognized by the United States Supreme Court in the above-quoted language, the appearance-of-impropriety standard is part of a code that serves to maintain the integrity of our judiciary and the confidence of the public.  *Caperton* recognized that appearances of partiality can rise to such an extreme level that the due process rights of parties become impaired, at which point disqualification is mandated by the United States Constitution.  But *Caperton* also recognized that states are free to impose more rigorous standards than due process requires, including the *appearance-of-impropriety* standard.  Accordingly, it is constitutional to expressly include this standard within the rule.

Further, I do not agree with any assertion that no other state requires recusal on the basis of a general *appearance-of-impropriety* standard.  This argument is premised on the assumption that there is a difference between the standard "*A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned*," and a standard that requires recusal if there is an "*appearance of impropriety*,"  However, this argument draws a distinction where none exists.  These standards are one and the same.  As acknowledged in *Caperton,* the test for appearance of impropriety is "'*whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.*'"  *Caperton*, 129 S Ct at 2266 (citation omitted; emphasis added).  This test *is* the standard for determining whether a judge's impartiality might reasonably be questioned.  The two are the same for purposes of disqualification.

Moreover, I do not agree with any assertion that incorporating the *appearance-of-impropriety* standard into our rule overshadows the other more specifically enumerated grounds for disqualification set forth in MCR 2.003(C)(1), or that the ABA Model Code[32]

---

[32] The ABA Model Codes can be found at

 <http://www.abanet.org/judicialethics/resources/resources_aba.html>  (accessed  March 22, 2010).

provides otherwise. The ABA Model Code does not define impartiality by reference to specifically enumerated examples of conduct, but rather uses the phrase "including but not limited to the following circumstances," followed by enumerated *nonexclusive* scenarios for recusal in which a "judge's impartiality might reasonably be questioned . . . ." Further, the comments to the ABA Model Code make clear that a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specifically enumerated provisions apply.

Finally, I find concerns about a justice's personal due process rights during the disqualification procedure to be misplaced. Rather, the proper concern is the rights of litigants to have a fair hearing by impartial jurists. I would direct those who believe that the rights of jurists are superior to the rights of the public to Canon 1 of the Code of Judicial Conduct, which provides:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. *A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. The provisions of this code should be construed and applied to further those objectives.* [Emphasis added.]

For all the above reasons, our disqualification rule is constitutional and appropriate.

CORRIGAN, J. (*not participating*).

I do not participate in the orders issued under the new version of MCR 2.003 for the reasons stated in my November 25, 2009, dissent from the rule's promulgation. Contrary to Chief Justice Kelly's assertions, Justice Young and I have exhaustively detailed our reasons for concluding that the rule is unconstitutional. See the order amending MCR 2.003, 485 Mich ___ (entered November 25, 2009, amended December 3, 2009, ADM 2009-4) (Corrigan, J., dissenting).[33] We also explain here that the duty to sit clearly cannot require official acts that would violate our oaths to uphold the federal and Michigan constitutions. Const 1963, art 11, § 1. Further, I object to the majority's application of the new rule to this case in light of its decision to adjourn the discussion of proposed changes to the rule previously scheduled for this Court's December 2009 and January 2010 public administrative hearings. As Justice Young observes, the proposed

---

[33] Available at

<http://courts.michigan.gov/supremecourt/Resources/Administrative/2009-04-112509.pdf> (accessed March 8, 2010).

changes are intended to bring the rule into compliance with minimal due process and First Amendment requirements, yet the majority here applies the rule in its current form before even discussing the proposals.

The rule currently requires a justice's recusal on the basis of a mere "appearance of impropriety . . . ." MCR 2.003(C)(1)(b). Yet my research has disclosed that no state requires recusal on the basis of a general "appearance of impropriety," let alone permits other justices to force a colleague's recusal on the basis of such a standard. See the chart attached to this statement as Exhibit A. Instead, a majority of states apply rules apparently derived from the American Bar Association (ABA) model rule, which requires recusal if a judge's "impartiality might reasonably be questioned . . . ."[34] Even those states with significantly different rules do not employ an "appearance of impropriety" standard. Further, the vast majority of states employ a practice similar to that of the United States Supreme Court's and Michigan's traditional practices: an individual justice decides whether recusal is required. Indeed, only eight states allow justices to cast votes on their colleagues' recusals.[35]

Significantly, the commonly used ABA standard—"[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned"—appears at the outset of the ABA model rule's listing of grounds for recusal. ABA Model Rule 2.11(A). The comparable threshold Michigan standard, which read "[a] judge is disqualified when the judge cannot impartially hear a case," has now been eliminated. See former MCR 2.003(B). Before its elimination, the Michigan threshold standard for recusal —like those in other states similar to the ABA model rule's threshold—was followed by enumerated, nonexclusive reasons for recusal that informed and limited the meaning of the threshold standard. For example, in Michigan and under the ABA rule, a judge is disqualified if he is actually biased or prejudiced, see current MCR 2.003(C)(1)(a) and ABA Model Rule 2.11(A)(1), or if he has an economic interest in the subject matter in controversy, see current MCR 2.003(C)(1)(f) and ABA Model Rule 2.11(A)(3). But Michigan has now deleted its threshold standard and simply offers a list of nonexclusive, stand-alone reasons that require recusal. Most significantly, Michigan alone includes the "appearance of impropriety" as one of these independent criteria for recusal, MCR 2.003(C)(1)(b). This unique Michigan provision renders superfluous the remaining, more specific enumerated grounds for recusal that we previously shared with the majority of our sister states. Why would a party need to show

---

[34] See 2007 ABA Model Code of Judicial Conduct, Canon 2, Rule 2.11 (ABA Model Rule 2.11), available at

<http://www.abanet.org/judicialethics/ABA_MCJC_approved.pdf> (accessed March 8, 2010).

[35] Further, many states' practices in this regard are unwritten and rarely exercised, so comparison is difficult.

that a justice is actually biased or has an actual economic interest in a case if that party can merely claim an *appearance* of impropriety under the generalized standards of Canon 2 of the Code of Judicial Conduct?

Chief Justice Kelly and Justice Hathaway assert that Michigan's "appearance of impropriety" standard is synonymous with the more common standard requiring recusal when "the judge's impartiality might reasonably be questioned." But, contrary to their implications, Michigan alone has adopted the "appearance of impropriety" as a stand-alone enumerated ground for recusal.[36] Although some courts consider the two standards to be roughly equivalent, the language is not identical, and the plain meaning of "appearance of impropriety" under Canon 2 strikes me as dangerously broad in this context. Most significantly, my colleagues ignore or unconvincingly explain away the central problem with the "appearance of impropriety" standard: as just explained, because of this Court's unprecedented choice to adopt this standard as an independent reason for recusal, it effectively renders nugatory the remaining more specific reasons for recusal. Thus, our new, stand-alone criterion for recusal is most certainly *not* comparable to other states' *threshold* standards requiring recusal when a judge's "impartiality might reasonably be questioned," which are circumscribed by concrete, illustrative lists of specific reasons for recusal. If the majority's genuine intent is to bring Michigan in line with other states' standards, it should adopt the common standard—requiring recusal when a judge's impartiality might reasonably be questioned—as a *threshold* standard at

---

[36] Chief Justice Kelly and Justice Hathaway incorrectly imply that the United States Supreme Court observed in *Caperton v A T Massey Coal Co, Inc,* 556 US ___; 129 S Ct 2252 (2009), that the vast majority of states have adopted the "appearance of impropriety" as a *disqualification* standard. To the contrary, as *Caperton* makes clear, most states—like Michigan—have adopted judicial conduct standards comparable to Canon 1 of the 2007 ABA Model Code of Judicial Conduct and the accompanying rules. But these standards are not equivalent to enforceable recusal rules, let alone recusal rules that may be raised by a party and enforced against an individual justice's will. Indeed, although Chief Justice Kelly lists various states that employ an "appearance of impropriety" standard, the standard appears in their judicial canons, as her statement candidly shows; the standard does not appear in their recusal rules. Justice Hathaway also relies on *Caperton,* but this Court has not adopted a rule reciting the ABA Model Code's test for appearance of impropriety cited in *Caperton*. Further, contrary to Justice Hathaway's implications, I do not conclude that the recusal standard employed by many states and apparently approved by *Caperton*—"the judge's impartiality might reasonably be questioned"—is unconstitutional. Rather, I contest the unprecedented, broad wording of the new Michigan standard *combined* with the new power of a majority of this Court to vote to remove a fellow coequal justice from a particular case in the absence of any procedural safeguards. As I explain further below, it is this combination of factors that I believe threatens the due process rights of Michigan justices *and* litigants appearing before this Court.

the outset of our rule.

Moreover, as noted, an "appearance of impropriety" standard for recusal is particularly problematic in light of the majority's decision that it is empowered to disqualify other justices from hearing a case. The Chief Justice concedes that allowing one justice to overrule another justice's decision on a recusal motion violates the maxim that each justice has equal power and authority with respect to his colleagues. Yet she now justifies this seizure of power on the mere ground that, in essence, the majority rules. That is no explanation for the Court's purported authority in this matter. "Appearance of impropriety" is too nebulous a standard to justify removal of a justice from a case against his will. Certainly Canon 2 of the Michigan Code of Judicial Conduct—like Canon 1 of the ABA Model Code and the comparable standards of many states—requires judges to "avoid all impropriety and appearance of impropriety." But we have no sound reason to incorporate this broad, aspirational standard into our binding, enumerated requirements for recusal. Because the standard is difficult to definitively apply, permitting a majority of justices to disqualify a peer on this basis creates a conspicuous threat to the due process rights of each member of this Court.

A written explanation by the voting justices of why they did or did not vote to disqualify a challenged justice from hearing a case does not solve this problem. Indeed, a written statement is meaningless. It does not afford due process when based on such a vague standard. The rule effectively gives a majority of justices carte blanche to disqualify their colleagues simply by articulating its impressions of why a challenged justice's participation *appeared* improper, without regard to the existence of the traditional, more objective grounds for recusal such as personal bias, involvement in the case, or economic interest in the case. This liberal procedure does not merely offend the removed justice's due process rights. As noted in my dissent from the adoption of our new rule, the rule nullifies the electoral choice of the people of Michigan by permitting the Court to decide which justices may participate in a given case. Moreover, particularly when, as in this case, one party seeks the recusal of justices and the other party opposes recusal, the procedure threatens the right of the opposing party to have his cause heard by an impartial court.

Recent developments in other states echo my previously stated concerns about the national push among a handful of well-funded interconnected advocacy groups to chill campaign speech in an effort to hamper judicial elections. See the order amending MCR 2.003, 485 Mich ___ (issued November 25, 2009, amended December 3, 2009, ADM 2009-4) (Corrigan, J., dissenting). In particular, the Wisconsin Supreme Court recently rejected new rules that would require a judge to recuse himself even if he received a lawful campaign contribution from a party. Commenting on the effort to "'deprive citizens who lawfully contribute to judicial campaigns . . . of access to the judges they help elect,'" Wisconsin Supreme Court Justice David Prosser, Jr., warned: "'I think the national recusal movement is an effort to so gum up [judicial] elections that we are

almost forced into an alternative, such as appointing judges.'" Koppel, *States Weigh Judicial Recusals,* Wall St J, January 26, 2010, at A8.

With general regard to Chief Justice Kelly's assertions, I concur fully in the responses offered by Justice Young. Indeed, it is not I who abdicate the duty to sit by declining to participate in the Court's decision under MCR 2.003. Quite to the contrary, the new formulation of MCR 2.003 threatens a justice's duty to sit in cases in which recusal would not be required by any other state in the nation. I have properly discharged my duty to sit by denying the motion for recusal directed at me; I stand ready to hear the controversy before us. I have also properly exercised the duties of my office—which are rooted in my oath to uphold the Constitution of the United States and the Michigan Constitution, Const 1963, art 11, § 1—by declining to participate in the majority's decision with regard to the motion for recusal directed at Justice Markman because I believe the new provisions of MCR 2.003 are unconstitutional.

For the foregoing reasons, I do not participate in the majority's decisions under the unconstitutional new version of MCR 2.003. I further continue to urge my colleagues to rethink their adherence to this new rule in its current form.

YOUNG, J. (*not participating*).

I do not participate in the order or the Court's decision-making under the new rule for the reasons stated in my November 25, 2009 dissent from the rule's promulgation.[37]

As I have previously stated, MCR 2.003 as amended is unconstitutional.[38] That the majority has refused to consider the significant constitutional issues arising under the amended rule that I have raised is especially troubling. In particular, on November 19, 2009, before the order amending MCR 2.003 entered, I circulated to the Court a series of substantive amendments that addressed the basic due process and First Amendment problems with the rule the majority nevertheless adopted on November 25, 2009.[39] In the

---

[37] See 485 Mich civ, cxxxii (2009) (Young, J., dissenting). At the time I denied the motion to disqualify, I issued a statement explaining my reasons for doing so. A copy of that statement is attached as Exhibit A.

[38] The Chief Justice claims that I "fail to cite any controlling authority for [my] assertion that MCR 2.003, as amended, or the 'appearance of impropriety' standard, generally, is unconstitutional." *Ante* at __ n 6. I invite the Chief Justice to reread (or read) my dissenting statement to the order amending MCR 2.003, entered on November 25, 2009, to become acquainted with the arguments that I marshal on behalf of my position on the rule's unconstitutionality. A copy of that order is attached as Exhibit B.

[39] A copy of the amendments I proposed that are currently before the Court, but have been passed twice from consideration at public conferences, is attached as Exhibit C.

more than four months since I proposed them, not only have the members of the majority failed to provide me with any written or oral feedback on these amendments, they have also refused to consider these amendments at our December 10, 2009, and January 27, 2010, public administrative conferences, even though they were scheduled to be considered. That the majority is willing to review their fellow justices' recusal decisions under the new rule in the face of its serious constitutional problems indicates an appalling indifference to the role of this Court in enforcing the rule of law.

### RESPONSE TO CHIEF JUSTICE KELLY AND JUSTICE HATHAWAY

Chief Justice Kelly's and Justice Hathaway's statements explaining the duty to sit and defending the constitutionality of MCR 2.003 contain little more than a pastiche of legal non sequiturs. As such, I will address the various points they raise seriatim.

(1) I am heartened to discover that the Chief Justice now recognizes the duty to sit. She is correct in stating that "'it is necessary that judges participate in cases in which recusal is not required.'"[40] However, because every justice takes an oath of office to uphold the constitutions of the United States and the state of Michigan,[41] a justice is also obligated to respect his or her constitutionally limited authority when deciding a case. Accordingly, just as a justice has the responsibility to raise sua sponte the issues of standing or subject matter jurisdiction in order to determine whether deciding the merits of a case exceeds the justice's constitutional authority, a justice has a similar responsibility not to rule on motions that require an action beyond the scope of that constitutional authority.

(2) Moreover, it is not clear that the duty to sit even applies to collateral motions *within* cases before this Court. The duty to sit requires a justice to "participate in *cases* in which recusal is not required."[42] Even though I do not participate in this Court's review of the motions to disqualify, I continue to participate in the defendant's underlying appeal

---

These proposed amendments are substantially similar to the proposed amendments that I circulated on November 19, 2009, but also incorporate some suggestions from Justice Markman that I received in the interim.

[40] *Ante* at __, quoting *Adair v Michigan*, 474 Mich 1027, 1030 (2006) (statement of Taylor, C.J., and Markman, J.).

[41] Const 1963, art 11, § 1 requires "[a]ll officers, legislative, executive and judicial, before entering upon the duties of their respective offices [to] take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state . . . ."

[42] *Adair*, 474 Mich at 1030 (statement of Taylor, C.J., and Markman, J.) (emphasis added).

in this case because my recusal is not required.[43]  For this independent reason, my nonparticipation in the decision of this motion is not a violation of my duty to sit.

(3) The Chief Justice generously notes that I am entitled to my view on the constitutionality of MCR 2.003.  While I am grateful that she concedes as much, the citizens of this state deserve more from its senior court.  It is not enough, as the Chief Justice asserts, to claim that all that this Court does is "clothed in a presumption of constitutionality."  Were that the case, there would be no need to consider any constitutional challenge to this Court's rules.  I have not challenged the constitutionality of MCR 2.003 lightly.  Even if my views are repudiated by this Court, the constitutional challenges I have raised deserve serious consideration by this Court. Thus far, the majority has studiously avoided consideration of these challenges, either before adopting this modified disqualification rule or afterward.

(4) Throughout their defenses of MCR 2.003, the Chief Justice and Justice Hathaway conflate two of the new substantive requirements under MCR 2.003 and in doing so also misleadingly suggest that the "appearance of impropriety" standard is one that the vast majority of states have adopted.  The previous substantive requirements requiring a judge's recusal under the former version of MCR 2.003 mandated recusal whenever "the judge cannot impartially hear a case . . . ."[44]  This was an actual bias standard.[45]  The former rule then provided a nonexclusive list of proxies for actual bias requiring recusal, as well as safe harbors that allowed a judge's participation in a case absent a different reason for disqualification.

The new substantive requirements mandate recusal when

[t]he judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v* [*A T*] *Massey* [*Coal Co, Inc*], [556] US ___; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), *or* (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.[46]

I need not rehash the persuasive evidence that Justice Corrigan has marshaled in her statement showing that Michigan is now *unique* in expressly adopting an "appearance of impropriety" standard as a basis for disqualification.  **To put the matter bluntly, there is**

---

[43] A copy of my statement denying the motion to disqualify is attached as Exhibit A.

[44] Former MCR 2.003(B).  This standard also appeared in GCR 1963, 912.2(a).

[45] *Cain v Dep't of Corrections*, 451 Mich 470, 495 (1996).

[46] MCR 2.003(C)(1)(b) (emphasis added).

**no other** **disqualification rule in the country like the one we have adopted.**

However, in defending the "appearance of impropriety" standard, the Chief Justice and Justice Hathaway also fail to recognize an important distinction between the two parts of MCR 2.003(C)(1)(b). The first part of this subrule recognizes the requirements of due process as articulated in *Caperton* and applies only when a judge's conduct affects the *due process rights* of a <u>party</u> in the context of a particular case. ***The second part of this subrule*** applies all of Canon 2 of the Michigan Code of Judicial Conduct ***without requiring that the judge's violation of Canon 2 be relevant to a party's rights in a particular case***.[47] Justice Hathaway claims that *Caperton* articulates a test for an "appearance of impropriety" centered on "'*whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.*'"[48] However, the "appearance of impropriety" standard contained in MCR 2.003(C)(1)(b)(ii) comes from the Michigan Code of Judicial Conduct, not *Caperton*, and, more importantly, ***does not contain any limiting language***. MCR 2.003(C)(1)(b)(ii) is a startling and supremely stupid policy that could have no conceivable purpose other than to permit a majority of this Court to remove a fellow justice for any violation of Canon 2, however unrelated to a justice's partiality or impartiality in an underlying case. Rather than disclaim such intention, the Chief Justice *confirms* that "grounds for recusal should not be narrowly confined to the case before the court in order for a justice to be removed from the case."[49] This admission, that a justice *should be removed for reasons having nothing to do with his or her ability to rule in a particular case*, speaks volumes and shows that the majority's intention in promulgating the new "appearance of impropriety" standard is to give the majority a large hammer to wield in its arbitrary use of power.

The Chief Justice's conflation of the distinction between the two clauses of MCR 2.003(C)(1)(b) renders misleading her claim that "federal district courts have rejected First Amendment constitutional challenges to a recusal standard that is synonymous with

---

[47] For example, Canon 2(A) requires a judge to "avoid all impropriety and appearance of impropriety." Also, contained within Canon 2(B) is the requirement that a judge "respect and observe the law." Accordingly, under the text of this new rule, a judge who received a traffic ticket for driving faster than the posted speed limit, and therefore who knowingly failed to "observe" the law, can be disqualified from a case for failing to meet the "appearance of impropriety" standard, *even if this conduct has no reasonable relevance to whether the judge can impartially hear cases before him*. This conclusion is borne out by the nature and relation of the two clauses. The first is limited to the parties' due process rights; the second is not.

[48] *Ante* at __, quoting *Caperton*, 129 S Ct at 2266 (emphasis in Justice Hathaway's statement).

[49] *Ante* at __ n 15.

the 'appearance of impropriety' standard . . . ."[50]  She cites five federal district court decisions that she purports accepted "such recusal rules" as "narrowly tailored to meet [the states'] interest and . . . neither overbroad nor vague."  The five cases that the Chief Justice cites, however, involved recusal rules that are *substantially narrower* than Michigan's unique "appearance of impropriety" standard.  They all relied on a standard requiring recusal when a judge's "impartiality might reasonably be questioned."  There is a significant difference between that standard and the "appearance of impropriety" standard the majority has now engrafted on the old rule.  The former has a longstanding provenance in the disqualification jurisprudence of many jurisdictions; the latter, none.

In *Alaska Right to Life Political Action Comm v Feldman*, for example, the United States District Court for the District of Alaska upheld the constitutionality of Alaska's judicial canon requiring recusal when a judge's "impartiality might reasonably be questioned":

> In summary, "[w]hen a judge may have a particular bias or prejudice, the recusal provisions require the judge to remove himself or herself from the case."  More specifically, "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ."  Without further analysis, the Court concludes this canon is narrowly tailored to serve a compelling State interest, i.e., it offers assurance to parties that the judge will apply the law in the same manner that would be applied to any other litigant.  Consequently, it survives Plaintiffs' constitutional challenge.[51]

The remaining four cases that the Chief Justice cites apply similar standards that specifically involve a judge's impartiality *in a given case*.[52]  As stated, the "appearance

---

[50] *Ante* at __.

[51] *Alaska Right to Life Political Action Comm v Feldman*, 380 F Supp 2d 1080, 1084 (D Alas, 2005) (citations omitted).

[52] *North Dakota Family Alliance, Inc v Bader*, 361 F Supp 2d 1021, 1043 (D ND, 2005) (interpreting ND Code of Judicial Conduct, Canon 3(E)(1), which requires a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned"); *Family Trust Foundation of Kentucky, Inc v Wolnitzek*, 345 F Supp 2d 672, 705-711 (ED Ky, 2004) (interpreting Ky Sup Ct R 4.300, Ky Code of Judicial Conduct, Canon 3(E)(1), which requires a judge to disqualify "himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned"); *Indiana Right to Life, Inc v Shepard*, 463 F Supp 2d 879, 886-887 (ND Ind, 2006) (interpreting former Ind Code of Judicial Conduct, Canon 3(E)(1), which required a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned"); *Bauer v Shepard*, 634 F Supp 2d 912, 948-950 (ND Ind,

of impropriety" standard contains no such limitation to a particular pending case. It has never been incorporated into a disqualification rule as has the "impartiality might reasonably be questioned" standard. If the goal of the new, supposedly "objective" standard is simply to prevent the risk of bias in the context of a particular case, then the first clause of the subrule suffices. However, if the "appearance of impropriety" clause is not to be rendered nugatory, it *must* apply generally to a judge's conduct, no matter how unrelated to the case at hand. I do not see how the majority can deny that the second clause must be broader than the first. If the members of the majority do, what is their justification for *permitting* the disqualification of a justice for a violation of Canon 2 that has nothing to do with a particular case? The breadth of this second clause alone should trouble the majority. Unfortunately, majorities rarely conceive or concede that *they* could be capable of abuse of power.

The prevention of an elected official from performing his or her duties is a very serious matter, and thus a rule allowing removal of a judge from a particular case should be clear and must be narrowly tailored to the circumstances of a particular case. Any other standard, including an "appearance of impropriety" standard encompassing all conduct, however unrelated to the case at hand, is impermissibly broad and interferes with the due process rights that inhere in the office. The lack of case-specific limitations of the "appearance of impropriety" clause illustrates the unseemly haste with which the majority was driven to amend not only the procedures for this Court's determination of disqualification motions but also the substantive standards by which such motions are decided.[53] Because the disqualification of a judge implicates the electorate's right to seat

_____

2009) (interpreting Ind Code of Judicial Conduct, Canon 2, Rule 2.11(A)(5), which requires a judge's recusal when that judge has made a public statement (other than one in a court proceeding, judicial decision, or opinion) that "commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy").

[53] Although disqualification has been an issue before the Court for some time, the "appearance of impropriety" standard is a much more recent development. This new standard was not incorporated into any of the three proposals that this Court published for comment in March 2009. See *Proposals Regarding Procedure for Disqualification of Supreme Court Justices*, 483 Mich 1205 (2009). Justice Hathaway first proposed the "appearance of impropriety" standard on October 22, 2009, two weeks prior to the November 5, 2009, administrative conference at which the Court voted on adopting the new standard. Moreover, I shared the following exchange with Justice Hathaway at that conference when I inquired about the nature of her proposed standard:

> *Justice Hathaway*: If there is an appearance of impropriety, then you cannot sit on a case.

> *Justice Young*: And from what perspective is the appearance of impropriety? Is it a subjective standard? Is it an objective standard?

a court of its choosing, the standards for disqualification must be exceedingly clear. The "appearance of impropriety" standard is anything but.

In conflating the general "appearance of impropriety" standard that the majority has promulgated with the case-specific standard that other states and *Caperton* require, the Chief Justice elides the important First Amendment issues uniquely involved in the context of Michigan's court rule. There are different issues involved when a judge's speech implicates a party's due process rights to have a neutral arbiter than when a judge's speech implicates a nonconstitutional "appearance of impropriety" court rule.[54] This is particularly true in light of the decision of the people of Michigan to retain their sovereign right to elect judges.

In every written constitution since 1850, the people of Michigan have retained their sovereign right to elect judges rather than surrender that right to some other process. Accordingly, judicial aspirants in Michigan campaign for judicial office. In campaigning, they will engage in political speech that is clearly protected under the First Amendment. The protection of speech guaranteed under the First Amendment is especially important within the context of political campaigns. James Madison, drafter of the First Amendment, wrote:

> The value and efficacy of [the right of elections] depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively.[55]

Thus, any restrictions on campaign speech not only infringe on a candidate's right to speak, but also infringe on the *public's* right to vote intelligently on their candidates.

---

*Justice Hathaway*: I haven't thought through all that to be honest with you, to answer you here.

*Justice Young*: But we're going to vote on this today.

*Justice Hathaway*: Then let's vote.

In light of this exchange, I will leave the reader to determine the correctness of Chief Justice Kelly's claim that "criticism of the amendments of MCR 2.003 as being 'hast[y]' is off the mark." *Ante* at __.

[54] I believe no one in the majority that promulgated the "appearance of impropriety" standard, including the Chief Justice, has urged that it was of constitutional dimension.

[55] James Madison, *Report on the Virginia Resolutions*, available at <http://press-pubs.uchicago.edu/founders/documents/amendI_speechs24.html> (accessed March 25, 2010).

The importance of citizens' decisions regarding whom to entrust with public office deserves no less than a robust public discussion of issues by candidates seeking their votes. ***The amended court rule frustrates this kind of political discussion between judicial candidates and voters and penalizes a judicial candidate for trying to do so.*** The amended court rule expressly contemplates that campaign speech protected under the First Amendment will nevertheless cause a duly elected judge to be disqualified from hearing a case. This is so because the new rule establishes that a judge's political speech is subject to an "appearance of impropriety" limitation that the Chief Justice recognizes extends beyond the due process requirements that *Caperton* mandated.

***Thus, even if the challenged political speech in no way implicated actual bias against a party (or any other constitutional right of that party), an elected justice would still be liable to be disqualified if his or her campaign comments were later determined to have created an appearance of impropriety.*** It is not hard to contemplate campaign speech that might offend someone's sensibilities and later be considered "improper" under the new rule's standard.

Moreover, the mere *threat* of future disqualification produces a chilling effect on protected speech. The United States Supreme Court's decision in *Republican Party of Minnesota v White* struck down the Minnesota Supreme Court's rule forbidding an incumbent judge or candidate for judicial office from "'announc[ing] his or her views on disputed legal or political issues'" during an election campaign.[56] While the Minnesota Supreme Court's restriction on campaign speech was more expressly content-based than the restrictions promulgated by the new rule, ***the new majority here is attempting to achieve indirectly what the United States Supreme Court declared in* White *that a court could not do directly: stifle protected judicial campaign speech.*** The new "appearance of impropriety" standard is so broad and vague that judges and judicial candidates will be forced to self-limit their campaign speech so that, once they are elected, they can actually exercise the duties of the office they have sought. **Thus, this rule is facially unconstitutional because it expressly allows a jurist's First Amendment right to free speech to be subordinated to a nonconstitutional standard.** *The new majority is untroubled by this obvious abridgement of First Amendment rights that their new rule causes. And the abridgment is even more invidious because the appearance of impropriety is not tied to a violation of a party's constitutional rights.*

(5) The Chief Justice also questions whether the removal of a judge from a case against his or her will for any speech protected under the First Amendment constitutes a sufficient injury in fact for standing purposes.[57] Such a claim denigrates the judicial offices that Michigan citizens have entrusted to their judges. The disqualification of a

---

[56] *Republican Party of Minnesota v White*, 536 US 765, 768 (2002) (citation omitted).

[57] *Ante* at __ n 9.

judge from exercising his or her judicial office in a particular case for having asserted protected speech is a cognizable injury in fact sufficient to establish standing. Indeed, though it did not decide the issue, the United States Court of Appeals for the Eleventh Circuit has recognized as "non-frivolous" the argument that "forcing a judge to disqualify himself . . . is a penalty in itself."[58] It is hard to imagine why removing a judge from a case would not support standing to challenge the legitimacy of the removal. It would be passing strange to contemplate any contrary rule under which the very officeholder being prevented from exercising the duties of office lacked standing to challenge the prevention. Chief Justice Kelly offers no rationale or authority for her assertion to the contrary. There is an obvious reason why she has not.

(6) The Chief Justice also states, in an entirely conclusory fashion and without citing any authority: "The rule does not deny any rights to a justice who is recused against his or her will." She fails to address the serious due process concerns that I expressed before the adoption of the amendments. Justice Hathaway responds to my arguments by calling into question my commitment to litigants' due process rights, noting that "concerns about a justice's personal due process rights during the disqualification procedure [are] misplaced" and suggesting that I "believe that the rights of jurists are superior to the rights of the public . . . ."[59] This is entirely untrue. The due process rights of litigants *must* be respected. However, that need not and may not be done by creating a process that itself is lacking in due process rights. Justice Hathaway's disregard of these *basic* due process rights speaks volumes. While the new rule protects the due process rights of litigants, it need not in Justice Hathaway's calculation provide judges with basic guarantees of due process when resolving disqualification motions.

Moreover, the *public* has an important interest in ensuring that their chosen judicial officers are treated fairly during the disqualification process, which is far from being a concern solely about *justices'* due process rights. The removal of a sitting justice against his or her will is a serious matter trenching upon the right to execute the duties of office to which the justice was elected as well as an infringement on the right of electors who placed the justice in office. Before the amendment of MCR 2.003, only a decision of the United States Supreme Court could reverse a Michigan justice's determination regarding a motion for recusal. In interposing itself in this decision as an appellate body, this Court must afford the targeted justice no fewer rights than he or she would enjoy in such an appeal to the United States Supreme Court of a denial of a motion for recusal. These include the right to have the matter heard by an impartial arbiter, the right to counsel, the right to have the issues framed, and the right to present arguments.

Thus, I have proposed that any appeal of a justice's denial of a motion for recusal

---

[58] *Florida Family Policy Council v Freeman*, 561 F3d 1246, 1255 (CA 11, 2009).

[59] *Ante* at __.

must be limited to the grounds stated in the motion and that the justice must be allowed to retain counsel in the matter and submit a brief in response to the motion.  If due process means anything—particularly in the disqualification setting, where this issue is pivotal—a targeted justice is most assuredly entitled to an *impartial* arbiter.[60]  When personal and political biases could affect the decision-making of members of this Court in the new disqualification appeal process, I cannot imagine that due process demands less than the right to challenge such potential biases of the decision-makers.  Accordingly, I proposed amendments that would ensure that this cardinal due process right is preserved, so that a targeted justice facing an appellate review of his or her denial of the recusal motion can challenge the potential biases of other members of this Court.  The members of the majority are loathe to permit such a bias challenge, but not because they fail to recognize that there are serious political and personal antagonisms among this Court's members.

Similarly, due process also demands an adequate opportunity for a challenged justice to be heard.[61]  Sometimes, this will also entail an evidentiary hearing.  I have therefore proposed a procedure for this Court taking evidence.  No justice in the majority has explained why any of the due process rights enjoyed before the new rule was promulgated have now lost their constitutional status.  I welcome any effort by the majority to justify why these due process rights have now been banished by the Michigan Supreme Court.

(7) The Chief Justice claims as "inapposite" my previous citation of provisions in the state constitution that limit the ability to remove a justice from office.[62]  It is true, as I have noted, that these constitutional provisions only refer to removal of a justice from *all* cases, not from a *particular* case.  However, as I explained in my dissent from the adoption of amended MCR 2.003, there is no provision in the Michigan Constitution that explicitly allows a majority vote of this Court to overturn the elective will of the People and remove a justice from an individual case, nor is there any language that would even implicitly provide such authority.  The Chief Justice offers no constitutional provision to refute this claim, only explaining that "[a] motion for the recusal of a justice is a 'controversy' like others that come before the Court."[63]  Clearly, there are limits even to this Court's adjudicative authority.  The Chief Justice does not, I hope, suggest that this Court has the constitutional authority to adjudicate *any* "controversy."  Moreover, as I have explained at length here and in my original dissenting statement, the removal of a

---

[60] "A hearing before an unbiased and impartial decisionmaker is a basic requirement of due process." *Crampton v Dep't of State*, 395 Mich 347, 351 (1975).

[61] "The fundamental requisite of due process of law is the opportunity to be heard." *Dow v Michigan*, 396 Mich 192, 205 (1976) (quotation marks and citations omitted).

[62] *Ante* at __.  See also 485 Mich civ, cxxxix-cxlii (2009) (Young, J., dissenting).

[63] *Ante* at __.

fellow justice from a case against the will of the electorate—potentially for reasons that have nothing to do with the justice's impartiality in a particular case—is far from an ordinary "controversy."

(8) Finally, the Chief Justice claims that my decision not to participate is tantamount to "announc[ing] by declarative fiat that the Court's action is null and void."[64]  I have never claimed that the Court's action is ineffective.  Instead, I merely dissent from the justifications, such as they are, for this Court's amended disqualification procedures because I reach a different constitutional conclusion: that the disqualification procedures fail to protect due process rights guaranteed under the United States Constitution.  The Chief Justice claims that my decision not to participate in disqualification proceedings is inconsistent with my participation in cases involving certified questions arising under MCR 7.305(B).  She quotes with approval my recent statement in a certified question case:

> I continue to adhere to my stated position in *In re Certified Question (Wayne Co v Philip Morris Inc)*, 622 NW2d 518 (Mich, 2001), that this Court lacks the authority under state law to answer certified questions. However, this position has failed to carry the day.  As the final arbiter of state law, this Court has concluded that it has the authority to answer certified questions.[65]

The Chief Justice and I, therefore, agree that this Court's declarations of state law are final.  Nevertheless, this Court's final authority does not extend to questions of *federal* constitutional law.  As I have explained, both above and in previous statements, the amendments to MCR 2.003 violate the protections of due process guaranteed by the United States Constitution.  This Court cannot abrogate these protections, and the

---

[64] *Ante* at __.

[65] *In re Certified Question (Waeschle v Oakland Co Med Examiner)*, 485 Mich ___ (Docket No. 140263, entered March 12, 2010) (Young, J., dissenting) (citation omitted).

majority's conclusion that the amendments to MCR 2.003 satisfy the United States Constitution does not authoritatively make it so. Accordingly, I refuse to participate in procedures that violate the protections of the United States Constitution.

CONCLUSION

I do not participate in the entry of the order or the Court's decision-making under the new disqualification rule. I believe that rule to have serious constitutional flaws. Moreover, my decision not to participate does not violate the duty to sit because deciding whether a fellow justice must be disqualified from hearing a particular case under the current court rule is inconsistent with my judicial duty to uphold the due process requirements of the United States Constitution.

CORRIGAN, J., joins the statement of YOUNG, J.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

March 31, 2010

_____
Clerk